Albert N. Kennedy, OSB No. 821429 (Lead Attorney)
  Direct Dial: 503.802.2013
  Facsimile: 503.972.3713
  E-Mail: albert.kennedy@tonkon.com
Michael W. Fletcher, OSB No. 010448
  Direct Dial: (503) 802-2169
  Facsimile: (503) 972-3867
  E-Mail: michael.fletcher@tonkon.com
TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, OR 97204-2099

    Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| In re | Case No. 19-30223-tmb11 |
|---|---|
| Western Communications, Inc. | **NOTICE OF FILING OF ASSET PURCHASE AGREEMENT WITH RHODE ISLAND SUBURBAN NEWSPAPERS INC. (BEND BULLETIN)** |
| Debtor. | |

    NOTICE IS HEREBY GIVEN that Debtor Western Communications, Inc. has entered into an Asset Purchase Agreement ("APA") with Rhode Island Suburban Newspapers Inc. The APA relates to the Notice of Intent to Sell Real or Personal Property that was filed on June 28, 2019 [ECF No. 182].

    DATED this 3rd day of July, 2019.

                    TONKON TORP LLP


                    By /s/ Michael W. Fletcher
                        Albert N. Kennedy, OSB NO. 821429
                        Michael W. Fletcher, OSB No. 010448
                        Attorneys for Debtor

**Page 1 of 1** -  NOTICE OF FILING OF ASSET PURCHASE AGREEMENT WITH RHODE
                ISLAND SUBURBAN NEWSPAPERS INC. (BEND BULLETIN)

# BEND ASSET PURCHASE AGREEMENT

by and between

**RHODE ISLAND SUBURBAN NEWSPAPERS INC.**
a Delaware corporation,
as Buyer,

and

**WESTERN COMMUNICATIONS, INC.**
an Oregon corporation,
as Seller,

July 3, 2019

# BEND ASSET PURCHASE AGREEMENT

This Bend Asset Purchase Agreement ("**Agreement**") is dated as of July 3, 2019 (the "**Effective Date**"), by and between Rhode Island Suburban Newspapers Inc., a Delaware corporation or an Affiliate to which it assigns its rights and obligations hereunder prior to Closing ("**Buyer**"), and Western Communications, Inc., an Oregon corporation, as debtor and debtor-in-possession ("**Seller**").

## RECITALS

Seller commenced a voluntary case (the "**Bankruptcy Case**") in the United States Bankruptcy Court for the District of Oregon (the "**Bankruptcy Court**") pursuant to Chapter 11 of Title 11 United States Code (the "**Bankruptcy Code**").

Seller desires to sell, assign, and transfer to Buyer, and Buyer desires to purchase and acquire from Seller, the Purchased Assets (defined below) free and clear of all liens, claims, encumbrances, and interests other than as expressly assumed hereunder, and, in connection therewith, Buyer will pay the Purchase Price and assume only the Assumed Liabilities (defined below), all upon the terms and subject to the conditions set forth in this Agreement.

The Purchased Assets are being used or held by Seller in the printing, publishing and distributing of Seller's The Bulletin daily newspaper, Redmond Spokesman weekly newspaper, TMC weekly publication, Go! weekly entertainment tabloid, Bend Homes monthly vertical, Area 97 bi-monthly magazine and Pulse quarterly magazine and certain related websites including www.bendbulletin.com and www.redmondspokesman.com (the "**Business**").

The execution and delivery of this Agreement and Seller's ability to consummate the transactions contemplated by this Agreement and the Ancillary Agreements (defined below) (the "**Contemplated Transactions**") are subject, among other things, to the approval of the Bankruptcy Court and entry of an order acceptable to Buyer authorizing and approving the transactions under Sections 105, 363, and 365 of the Bankruptcy Code.

In consideration of the promises and the mutual agreements and covenants set forth in this Agreement, and intending to be legally bound, Buyer and Seller agree as follows:

## ARTICLE 1
## DEFINITIONS

Unless the context otherwise requires, capitalized terms defined in the attached Exhibit A shall have the meanings ascribed to such terms in Exhibit A when used in this Agreement.

## ARTICLE 2
## PURCHASE AND SALE OF PURCHASED ASSETS

**Section 2.1.     Purchase and Sale of Assets.**  Upon the terms and subject to the conditions set forth in this Agreement and as otherwise set forth in the Ancillary Agreements,

and to the maximum extent permitted by the Bankruptcy Code, at Closing Seller shall sell, convey, assign, transfer, and deliver to Buyer, and Buyer shall purchase and acquire from Seller, free and clear of any Liens, other than Permitted Liens, all of Seller's rights, title, and interests in, to, and under all of the rights, properties, and assets of Seller used in or held for use in the Business on the Closing Date, including all right, title, and interest of Seller in, to, and under the following property and assets of Seller, except to the extent such property and assets are defined in this Agreement as "Excluded Assets" (collectively, the **"Purchased Assets"**):

(a)     all assets located at the Facilities on the Closing Date (other than personal property owned by Seller's employees) or that are related to or used primarily in the conduct of the Business, including vehicles, equipment, machinery, furniture, fixtures, trade fixtures, leasehold improvements, office materials, and supplies;

(b)     all supplies, Inventory and fixed assets of the Business;

(c)     all Accounts Receivable;

(d)     each of the publications produced by the Business (and all rights to prepare, publish, sell and distribute such publications and all inventories of back and current issues of such publications),

(e)     all data and records, in tangible or electronic form, produced by, used in or held for use in the operations of the Business, including customer, subscriber, circulation and advertiser lists and any and all records or information related to the same; referral sources; research and development reports and records; production reports and records related to the same; service and warranty records; equipment logs; operating guides and manuals; creative materials; advertising materials; promotional materials; studies; reports' correspondence; and all other similar documents and records;

(f)     all vendor lists and carrier routes;

(g)     all goodwill and general intangibles of Seller associated with the Business or the Purchased Assets, including associated going-concern value, and all of Seller's rights (both legal and equitable) to protect their rights and interests with respect to the Business to the extent they relate to the Purchased Assets and the Assumed Liabilities;

(h)     all of Seller's rights and benefits in, to and under the Seller Confidentiality Agreements as well as any Contracts identified on attached <u>Schedule 2.1(h)</u> (which schedule shall include Seller's representation as to all Cure Costs for each Contract) as it may be amended from time to time, including all prepaid deposits thereunder (collectively, the "Assumed Contracts") provided, however, Buyer shall have up to and including the Closing Date to designate which Contracts it intends to retain as Assumed Contracts**;**

(i)     to the extent transferable, all franchises, permits, licenses, waivers, and authorizations, used in or held for use in the Business (collectively, the **"Permits and Licenses"**);

(j)      all causes of action against third parties (whether or not asserted, choate or inchoate, contingent or non-contingent, as of Closing Date) relating to the Purchased Assets, the Assumed Liabilities and/or the Business, including against vendors, suppliers, and customers thereof, or Seller's operations relating to the Business, excluding all causes of action arising under Chapter 5 of the Bankruptcy Code or under similar state law;

(k)      the amount of, and all rights to any, insurance proceeds received by Seller after the Effective Date in respect of the loss, destruction, or condemnation of any Purchased Asset occurring prior to or after Closing or relating to any Assumed Liabilities;

(l)      to the extent transferable, all unexpired, transferable representations, warranties, indemnities, or guaranties made by any third party with respect to the Purchased Assets;

(m)      all Intellectual Property Rights (excluding trademarks and tradenames) and telephone numbers used in or held for use in the conduct of the Business, including any Intellectual Property Rights specifically identified on a schedule to be mutually agreed by Buyer and Sellers at or prior to Closing;

(n)      the trademarks and trade names used by the Business, including any specifically identified on a schedule to be mutually agreed by Buyer and Seller at or prior to Closing (the "**Trademarks**");

(o)      all licenses issued, granted, given or otherwise made available to Seller;

(p)      all lease deposits, prepaid expenses, claims for refunds, rights to rebates and rights to offset of the Business; and

(q)      any additional assets of Seller specifically identified on a schedule to be mutually agreed by Buyer and Seller at or prior to Closing (the "**Additional Assets**").

**Section 2.2.**      **Excluded Assets.**  Notwithstanding anything to the contrary contained elsewhere in this Agreement, the following assets of Seller, whether or not related to the Business (collectively, the "**Excluded Assets**"), are not part of the sale and purchase contemplated hereunder, are excluded from the Purchased Assets, and shall remain the property and responsibility of Seller after Closing:

(a)      all cash, cash equivalents, securities and negotiable instruments of Seller on hand, in lock boxes, in financial institutions, or elsewhere, including all cash residing in any collateral cash account and all deposits securing any obligation or contingent obligation of Seller or any of its Affiliates;

(b)      all corporate seals, minute books, and stock records;

(c)      all current and prior insurance policies held by or for the benefit of Seller (including life insurance policies) and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance policies, other than as provided in Section 2.1(a) or Section 7.4;

(d)     all personnel records and other records that Seller is required by law to retain in its possession;

(e)     all claims for refund of Taxes and other governmental charges of whatever nature for any period prior to the Closing Date;

(f)     all Tax Returns of Seller;

(g)     all rights in connection with and assets related to any Employee Plans;

(h)     all loans, receivables, and payables among Seller and any of its Affiliates, whether or not evidenced in writing, and all promissory notes and other records or materials evidencing same;

(i)     any Excluded Contract and rights thereunder;

(j)     all personal property (tangible and intangible), whether or not located at any of the Facilities, that is not primarily used in the conduct of the Business, including such personal property located at 1777 SW Chandler Avenue Bend, OR 97702;

(k)     intentionally omitted;

(l)     all rights of Seller under this Agreement or under other documents or agreements to be executed and delivered in connection with this Agreement;

(m)     any real property owned by Seller; and

(n)     any other right, property, or asset specifically identified on a schedule to be mutually agreed by Buyer and Sellers at or prior to Closing.

For the avoidance of doubt, the Excluded Assets shall include all assets (tangible or intangible) or liabilities primarily used in, held for use in, or related to the newspapers and other publications other than Seller's The Bulletin daily newspaper, Redmond Spokesman weekly newspaper, TMC weekly publication, Go! weekly entertainment tabloid, Bend Homes monthly vertical, Area 97 bi-monthly magazine and Pulse quarterly magazine and certain related websites.

### Section 2.3.     Assumption of Liabilities

(a)     <u>Assumed Liabilities</u>.  To the maximum extent permitted by the Bankruptcy Code, subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform, and discharge only the following Liabilities of Seller, and no others (the "**Assumed Liabilities**"), which Buyer shall assume and pay, perform, and discharge in accordance with their respective terms:

(i)     all Liabilities of Seller under the Assumed Contracts that arise out of or relate to the period from and after the Closing Date;

      (ii)      in respect of each Assumed Contract for which all necessary consents of the Bankruptcy Court have been obtained, the obligation to pay Cure Costs;

      (iii)     the unearned subscription liability as of the Closing Date;

      (iv)     all Liabilities in respect of Permits and Licenses (other than any that is an Excluded Contract), including filing and other fees related thereto;

      (v)      all personal Property Taxes and assessments on the Purchased Assets that relate to the period from and after the Closing Date; and

      (vi)     all Liabilities arising as a result of the ownership, operation, and use of the Purchased Assets by Buyer or its Affiliates from and after the Closing Date.

(b)    <u>Retained Liabilities</u>.  The Retained Liabilities will remain the sole responsibility of and shall be retained by Seller, and Buyer will assume no responsibility whatsoever for the Retained Liabilities.  "**Retained Liabilities**" means all Liabilities of Seller or the Business of any kind or nature, whether known or unknown, absolute, contingent, or otherwise, and whether or not related to the Purchased Assets, other than the Assumed Liabilities.

**Section 2.4.**    **Assumed Contracts**.  Seller will file with the Bankruptcy Court a motion to assume and assign the Assumed Contracts (if any), and to determine Cure Costs with respect thereto.  With respect to each Assumed Contract, subject to Bankruptcy Court approval, Seller shall assume and assign such Assumed Contract to Buyer at Closing.  The Sale Order shall provide that, as of Closing, each Assumed Contract is assigned from Seller to Buyer.

**Section 2.5.**    **Non-Assignable Contracts.**  Notwithstanding anything to the contrary herein, this Agreement shall not constitute an agreement to assign or transfer any interest in any Assumed Contract, or any claim or right arising thereunder, if such assignment or transfer, without the consent or approval of a third party, would constitute a breach thereof, would affect adversely the rights of Buyer thereunder or violate any applicable law (including Section 365 of the Bankruptcy Code), and any such transfer or assignment shall be made subject to any necessary consents or approvals being obtained.  In the event any such consent or approval is not obtained prior to Closing, Seller shall continue its reasonable efforts to obtain any such consent or approval after Closing, and Seller will cooperate with Buyer in any lawful and economically feasible arrangement to provide that Buyer shall receive all interests of Seller from, and the benefits under, any such Assumed Contract, including performance by Seller as agent, provided that Buyer shall pay or satisfy the corresponding liabilities for the enjoyment of such benefit to the extent Buyer would have been responsible therefor if such consent or approval had been obtained.  Nothing in this <u>Section 2.5</u> shall be deemed a waiver by Buyer of its right to receive, prior to Closing, an effective assignment of all of the Assumed Contracts, nor shall this <u>Section 2.5</u> be deemed to constitute an agreement to exclude from the Purchased Assets any assets described under <u>Section 2.5</u>.

## ARTICLE 3
## PURCHASE PRICE AND PAYMENT

**Section 3.1.** **Purchase Price.** The aggregate combined consideration for the Purchased Assets (the "**Purchase Price**"), including all amounts, costs, and expenses relating to the Contemplated Transactions, shall be Two Million, Two Hundred and Fifty Thousand U.S. dollars ($2,250,000.00), subject to adjustment as provided herein, and the assumption of the Assumed Liabilities.

**Section 3.2.** **Payment of Purchase Price.** Buyer shall pay the Purchase Price as follows:

(a) no later than 15 days after the execution of this Agreement, Buyer shall deposit with Seller's counsel, to be held in trust until disbursed pursuant to this Agreement, a good faith deposit of Two Hundred and Twenty-Five Thousand U.S. Dollars ($225,000.00) (the "**Deposit**"), which shall be applied toward Buyer's payment of the Purchase Price at Closing if Buyer is the successful purchaser, or otherwise released to Buyer or Seller, as the case may be, in accordance with this Agreement;

(b) payment of any Cure Costs by wire transfer of immediately-available funds;

(c) payment of any other costs due and payable as of Closing as a result of the Contemplated Transactions, the obligations for which Buyer has assumed under this Agreement; and

(d) the remainder of the Purchase Price (minus the amounts set forth in the foregoing (b) and (c)) (the "**Closing Date Payment**") shall be paid to Seller at Closing, in accordance with the Allocation, by wire transfer of immediately-available funds to such account(s) indicated by Seller.

**Section 3.3.** **Purchase Price Adjustment.** With respect to any employees of the Seller hired by Buyer, Buyer will assume all accrued holiday leave, sick leave, vacation leave or other leave benefits for such employees hired by Buyer, that would be payable by the Seller upon termination of employment at Closing, and will credit such employees with all such earned but unused accrued leave. In turn, Buyer will receive a corresponding credit at Closing against the Purchase Price for the assumption of such earned but unused accrued leave.

**Section 3.4.** **Allocation.** The Purchase Price and the Assumed Liabilities (to the extent required by the Code) shall be allocated among the Purchased Assets on the Closing Date in a manner to be mutually agreed by Buyer and Sellers at or prior to Closing and in a manner consistent with Section 1060 of the Code and the regulations thereunder, which allocation will be agreed to by Seller and Buyer prior to the Closing Date (the "**Allocation**"). If Seller and Buyer are unable to agree upon the Allocation by the Closing Date, the disputed items shall be resolved by an independent accounting firm that is mutually agreed upon by Seller and Buyer and any such resolution thereto shall be final and binding on the Parties hereto absent manifest error. The cost of any such accounting firm shall be split evenly between Seller and Buyer. Any adjustments to the Purchase Price made pursuant to the provisions of this Agreement shall be reflected in the Allocation in a manner consistent with Section 1060 of the Code and the

Case 19-30223-tmb11    Doc 194    Filed 07/03/19

regulations thereunder.  Subject to the foregoing provisions of this <u>Section 3.4</u>, after Closing the parties shall file all tax returns, declarations, and reports with the IRS in respect thereof, including the reports required to be filed under Section 1060 of the Code, in a manner consistent with the Allocation.  Seller and Buyer agree to cooperate with each other in preparing IRS Form 8594, and to furnish the other with a copy of such form prepared in draft form 10 days prior to its filing due date.  If such Allocation is disputed by any Governmental Body, the party receiving the notice of such dispute will promptly notify the other parties and the parties will use their respective commercially reasonable efforts to sustain the final Allocation.  The parties shall share information and cooperate to the extent reasonably necessary to permit the Contemplated Transactions to be properly, timely, and consistently reported.

**ARTICLE 4**
**CLOSING**

**Section 4.1.     Closing Date.**  Upon the terms and conditions set forth in this Agreement, the closing of the Contemplated Transactions (the "**Closing**") shall occur as promptly as practicable at a date and time mutually agreed upon by Buyer and Sellers, and no later than the fifth Business Day following the date on which the Sale Order has either been entered or becomes a Final Order, at the election of Buyer.  The date on which Closing actually occurs is referred to as the "**Closing Date**".  Notwithstanding anything in this section or this Agreement generally, Closing shall take place as set forth in the Bid Procedures Order or as otherwise ordered by the Bankruptcy Court.

**Section 4.2.     Closing Obligations**

(a)     <u>Seller Deliveries</u>.  In addition to any other documents to be delivered under other provisions of this Agreement, at Closing, Seller shall deliver to Buyer:

(i)     intentionally omitted;

(ii)     an executed counterpart to the Bill of Sale and Instrument of Assignment of Assets and Assumption of Liabilities, the form of which is attached as <u>Exhibit 4.2(a)(ii)</u> (the "**Bill of Sale**");

(iii)     an executed counterpart of an Assignment and Assumption Agreement, effecting the assignment to Buyer from Seller of all Assumed Contracts, to the extent approved by the Sale Order, the form of which is attached as <u>Exhibit 4.2(a)(iii)</u> (the "**Assignment and Assumption Agreement**");

(iv)     an executed counterpart of a Trademark Assignment and Assumption and License Agreement, a Copyright Assignment and Assumption and License Agreement, and a Domain Name Assignment the form of each which is attached as <u>Exhibit 4.2(a)(iv)(A)</u>, <u>Exhibit 4.2(a)(iv)(B)</u> and <u>Exhibit 4.2(a)(iv)(C)</u>, respectively (together, the "**IP Assignment and License**");

(v)     a Seller's certificate effective as of the Closing Date in a form to be mutually agreed by Buyer and Sellers at or prior to the Closing;

(vi)     a FIRPTA affidavit, executed by the Seller, that Seller is not a "foreign person" within the meaning of Internal Revenue Code Section 1445 or successor statutes;

(vii)     the original certificates of title for any vehicles included in the Purchased Assets;

(viii)     an executed counterpart of a lease providing Buyer access to the Facilities following the Closing, the form of which is attached as <u>Exhibit 9.1(f)</u> hereto (the "**Bend Lease**");

(ix)     executed counterparts of each Ancillary Agreement to which Seller is a party; and

(x)     each other document reasonably requested by Buyer to transfer the Purchased Assets in accordance with the terms of this Agreement.

(b)     <u>Buyer Deliveries</u>.  In addition to any other documents to be delivered under other provisions of this Agreement, at Closing, Buyer shall deliver:

(i)     to Seller:

a)     the Closing Date Payment, by wire transfer of immediately-available funds;

b)     an executed counterpart of the Assignment and Assumption Agreement;

c)     an executed counterpart of the IP Assignment and License;

d)     an executed counterpart of the Bend Lease; and

e)     executed counterparts of each Ancillary Agreement to which Buyer is a party; and

(ii)     to the applicable counterparties of the applicable Assumed Contracts, the amount of the Cure Costs; and

(iii)     to the applicable recipients, any other amounts due and payable as of Closing as a result of the Contemplated Transactions, the obligations for which Buyer has assumed under this Agreement.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer as follows, all of which representations and warranties shall expire at Closing:

**Section 5.1.**     Seller is a corporation duly organized and validly existing under the laws of Oregon and it is qualified to do business in every jurisdiction in which it is required to be qualified. Seller has the corporate power and authority to own, lease, and operate the Purchased Assets owned by it, and to carry on the Business as currently conducted by it. Seller has full corporate power and authority to execute and deliver this Agreement, the Ancillary Agreements to which it is a party and, subject to entry of the Sale Order, to consummate the Contemplated Transactions. This Agreement has been, and the Ancillary Agreements to which Seller is a party will be, duly executed and delivered by Seller and, subject to entry of the Sale Order, shall constitute the valid and binding agreement of Seller, enforceable in accordance with their respective terms.

**Section 5.2.**     Subject to entry of the Sale Order, the execution, delivery, and performance by Seller of this Agreement and the consummation of the Contemplated Transactions do not and will not (a) violate Seller's articles of incorporation, bylaws, or other organizational documents; (b) violate any Legal Requirements applicable to Seller; (c) constitute a default under or give rise to any right of termination, cancellation, or acceleration of any right or obligation, or to a loss of any benefit relating to any Purchased Assets owned by Seller to which Seller is entitled under any provision of any agreement or other instrument binding upon Seller, except for breaches and defaults referred to in Section 365(b)(2) of the Bankruptcy Code; or (d) result in the creation or imposition of any Lien on any Purchased Assets owned by Seller, except for Liens to be released at or prior to, or in connection with, Closing.

**Section 5.3.**     Seller has and, upon delivery to Buyer on the Closing Date of instruments of transfer contemplated herein, as authorized by the terms of the Sale Order, Seller will thereby transfer to Buyer good and marketable title to, or in the case of property leased or licensed by Seller, a valid and subsisting leasehold interest in, or a legal, valid, and enforceable licensed interest in or right to use, all of the Purchased Assets free and clear of Liens other than Permitted Liens.

**Section 5.4.**     Since the commencement of the Bankruptcy Case, Seller has not provided any confidential information regarding the potential sale of the Purchased Assets or the Business to any party who has not signed a confidentiality agreement.

**Section 5.5.**     The Purchased Assets include all of the goodwill of the Business and are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property and assets necessary to conduct the Business.

**Section 5.6.**     To the knowledge of Seller, the Cure Costs listed in <u>Schedule 2.1(f)</u> reflect the amount that must be paid to the non-debtor party pursuant to Section 365 of the Bankruptcy Code to cure any outstanding defaults under the respective Contracts.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

**Section 6.1.**     Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware, with full corporate power and authority to conduct its business as it is now conducted.

**Section 6.2.**     Buyer has full corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is a party, and to consummate the Contemplated Transactions.  This Agreement has been, and the Ancillary Agreements to which Buyer is a party will be, duly executed and delivered by Buyer and shall constitute the valid and binding agreement of Buyer, enforceable in accordance with their respective terms.

**Section 6.3.**     Neither the execution and delivery of this Agreement nor any of the Ancillary Agreements by Buyer, nor the consummation or performance of any of the Contemplated Transactions by Buyer, will (a) conflict with or violate any provision of Buyer's articles of incorporation or bylaws (or similar organizational documents); (b) conflict with or violate any resolution adopted by the board of directors of Buyer; (c) constitute a violation of or be in conflict with any Legal Requirement or Order to which Buyer may be subject; or (d) constitute a violation of, be in conflict with, or constitute a breach or default (with or without notice or lapse of time or both) under any Contract to which Buyer is a party or by which Buyer may be bound.  Subject to entry of the Sale Order, Buyer is not, and will not be, required to obtain any consent from any Person or Governmental Body other than consents, approvals, or authorizations of, or declarations or filings with the Bankruptcy Court, in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Contemplated Transactions.

**Section 6.4.**     Buyer has sufficient immediately-available funds to pay at Closing, in cash, the Purchase Price.

**Section 6.5.**     Neither Buyer nor any of its representatives have incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with the Contemplated Transactions.

**Section 6.6.**     There is no pending or threatened proceeding by or against Buyer or any Affiliate of Buyer that could materially prevent or delay the Contemplated Transactions.

**Section 6.7.**     Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and the other documents referred to herein, and to consummate the Contemplated Transactions, Buyer has relied solely on the express representations and warranties of Seller set forth in Article 5; (b) neither Seller nor any other Person has made any representation or warranty as to Seller, the Purchased Assets, the Business, or this Agreement, except as expressly set forth in Article 5 and including as to (i) merchantability or fitness for any particular use or purpose, (ii) the operation of the Business by Buyer after Closing in any manner, or (iii) the probable success or profitability of the Business after Closing; (c) Buyer has conducted its own independent investigation, review, and analysis of the business, operations, assets, liabilities, results of operations, financial condition, software, technology, and prospects of the Business and the Purchased Assets, which investigation, review, and analysis was done by Buyer and its representatives; and (d) Buyer and its representatives have been provided

reasonable access to the personnel, properties, premises, and records of the Business and the Purchased Assets for such purpose.

**Section 6.8.** Buyer hereby acknowledges and agrees that, except as otherwise expressly provided in this Agreement, Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Business or the Purchased Assets, including income to be derived or expenses incurred in connection with the Business, the Purchased Assets, the physical condition of any tangible, intangible, or real property comprising a part of the Purchased Assets or which is the subject of any Assumed Contracts assumed by Buyer at Closing Date; the environmental condition; other matters relating to the physical condition of any real property or improvements which are the subject of any Assumed Contract; the value or transferability of the Purchased Assets (or any portion thereof); the terms, amount, validity, or enforceability of any Assumed Liabilities; or the merchantability or fitness of the Purchased Assets for any particular purpose. Without limiting the foregoing, Seller hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any of the Purchased Assets (or any portion thereof). If Closing occurs, Buyer further acknowledges that Buyer will accept the Purchased Assets at the Closing Date "As Is," "Where Is" and "With All Faults," subject to the provisions of this Agreement and the Sale Order, providing that the sale of the Purchased Assets is free and clear of all Liens, other than Permitted Liens.

## ARTICLE 7
## COVENANTS

**Section 7.1.** **Advice of Changes**. Seller shall promptly advise Buyer in writing of any event occurring subsequent to the date of this Agreement that (a) would render any representation or warranty of Seller contained in this Agreement, if made on or as of the date of such event or the Closing Date, untrue or inaccurate in any material respect; or (b) would constitute a Material Adverse Effect on the Business or Purchased Assets, individually or in the aggregate.

**Section 7.2.** **Maintenance of Business**. Seller shall use commercially reasonable efforts to carry on and preserve the Business and its relationships with customers, suppliers, employees, and others in all material respects in substantially the same manner as it has prior to the date hereof. Upon request by Buyer, Seller shall use commercially reasonable efforts to facilitate Buyer's contact and communication with employees and customers, suppliers, vendors, and distributors of the Business.

**Section 7.3.** **Conduct of Business by Seller**. Except as contemplated by this Agreement or consented to in writing by Buyer (which consent shall not be unreasonably withheld) during the period from the date hereof to the Closing Date, Seller shall conduct the Business in the ordinary course of business consistent with past practice and, to the extent consistent therewith, with no less diligence and effort than would be applied in the absence of this Agreement, use its commercially reasonable efforts to preserve intact its current business operations, keep available the service of its current officers and employees, and preserve its relationships with customers, suppliers, advertisers, distributors, lessors, creditors, employees, contractors and others having business dealings with it, with the intention that its goodwill and

Case 19-30223-tmb11    Doc 194    Filed 07/03/19

ongoing businesses shall be unimpaired at the Closing Date except to the extent such impairment is caused by the Bankruptcy Case.

**Section 7.4.** **Damage or Destruction.** Until Closing, the Purchased Assets shall remain at the risk of Seller. In the event of any material damage to or destruction of any Purchased Asset (other than normal wear and tear) after the date hereof and prior to Closing (in any such case, a "**Loss**"), Seller shall give notice thereof to Buyer. If any such Loss is covered by policies of insurance, such that proceeds of such insurance are sufficient to replace or to repair such Purchased Asset to its condition and value prior to such damage or destruction, all right and claim of Seller to such proceeds of insurance for such Loss shall be assigned and (if previously received by Seller and not used prior to the Closing Date to repair any damage or destruction) paid to Buyer at Closing, and Buyer shall complete the Contemplated Transactions as provided in this Agreement without any reduction in the Purchase Price with respect to such Loss to the extent such insurance or proceeds of insurance are assignable.

**Section 7.5.** **Confidentiality.** The terms of the confidentiality and nondisclosure agreement dated as of March 13, 2019 (the "**Confidentiality Agreement**") between Seller and Buyer are incorporated herein by reference, and shall continue in full force and effect until Closing; at which time the confidentiality provisions under the Confidentiality Agreement shall terminate; provided, however, that such obligations shall terminate only in respect of that portion of the Confidential Information (as defined in the Confidentiality Agreement) relating to the Business; provided, further, that notwithstanding anything herein or in the Confidentiality Agreement to the contrary, Seller shall not be prevented from disclosing the name of Buyer or the existence of this Agreement or any Ancillary Agreement solely to the extent disclosure is required by the Bankruptcy Court. If this Agreement is for any reason terminated prior to Closing, the Confidentiality Agreement shall nonetheless continue in full force.

**Section 7.6.** **Permits and Licenses.** The parties, cooperating in good faith, shall use reasonable efforts to take such steps, including the filing of any required applications with Governmental Bodies, including the Bankruptcy Courts, as may be necessary (a) to effect the transfer of any Permits and Licenses to Buyer on or as soon as practicable after the Closing Date, to the extent such transfer is permissible under applicable Legal Requirements; and (b) to enable Buyer to obtain, on or as soon as practicable after the Closing Date, any additional licenses, permits, approvals, consents, certificates, registrations, and authorizations (whether governmental, regulatory, or otherwise) as may be necessary for the lawful operation of the Business from and after the Closing Date (the actions described in the foregoing clauses (a and (b) being referred to herein as the "**Permitting Process**"). Any filing or other fees and other out-of-pocket expenses associated with the Permitting Process shall be paid by Buyer. Buyer acknowledges that it may not be possible to complete the Permitting Process prior to the Closing Date, and agrees that completion of the Permitting Process prior to the Closing Date shall not be a condition to its obligation to proceed with the Contemplated Transactions. However, if necessary, Seller shall provide Buyer with reasonable assistance, as requested by Buyer, after the Closing Date to complete the Permitting Process.

**Section 7.7.** **Bulk Transfer Legal Requirements.** Buyer hereby waives compliance by Seller with any applicable bulk sale or bulk transfer laws of any jurisdiction in connection with the sale of the Purchased Assets to Buyer.

**Section 7.8.    Further Action.**  The parties shall use all reasonable efforts to take, or cause to be taken, all appropriate action to do or cause to be done all things necessary, proper, or advisable under applicable Legal Requirements, and to execute and deliver such documents and other papers as may be required to carry out the purposes of this Agreement and the Contemplated Transactions.

**Section 7.9.    Tax Cooperation and Exchange of Information.**  The parties will provide each other with such cooperation and information as may be reasonably requested in filing any Tax Return, amended Tax Return, or claim for refund, determining any liability for Taxes or a right to a refund of Taxes, or participating in or conducting any audit or other proceeding in respect of Taxes relating to the Purchased Assets or the Business.  Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules and related work papers and documents relating to rulings or other determinations by taxing authorities.  Each of the parties will make themselves (and their respective employees) available, on a mutually convenient basis, to provide explanations of any documents or information provided under this Section 7.9.

**Section 7.10.    Conveyance Taxes.**  In the event any Conveyance Taxes (as may be reduced or eliminated pursuant to Section 1146(a) or (b) of the Bankruptcy Code and/or the Sale Order entered by the Bankruptcy Court) are assessed on the transfer of the Purchased Assets to Buyer, Seller shall pay such Conveyance Taxes.  Seller shall complete and file all returns associated therewith, subject to reasonable review and comment by Buyer.

**Section 7.11.    Proration of Taxes and Certain Charges.**  All Property Taxes or similar ad valorem obligations levied with respect to the Purchased Assets (the "**Accrued Charges**"), including all power and utility charges, shall be prorated as of the Closing Date. Buyer shall receive a corresponding credit at Closing against the Purchase Price for any and all Accrued Charges allocable to Seller that remain unpaid as of the Closing Date. Buyer shall be responsible for all such Accrued Charges attributable to the period from and after the Closing Date, subject to the terms of the Bend Lease.

**Section 7.12.    Personal Information.**  In respect of any personal information contained in the books and records of Seller that Buyer has had access to or acquires at Closing, Buyer will: (a) before Closing, use the personal information solely for purposes relating to the Contemplated Transactions and, if Closing does not occur, comply with Buyer's obligations under the Confidentiality Agreement with respect thereto; and (b) if Closing does occur, then after Closing, use and disclose any such personal information for employment and such other purposes as Buyer deems appropriate, in each case in compliance with all applicable Legal Requirements. Without limiting the preceding, the proposed sale includes the sale or transfer of certain personally identifiable information as that term is defined in 11 U.S.C. § 101(41A) of the Bankruptcy Code. Under Section 363(b)(1) of the Bankruptcy Code, Seller may not sell such personally identifiable information unless the sale is consistent with the debtor's privacy policy. Buyer has reviewed Seller's existing privacy policy, attached hereto as Exhibit 8.13, (the "**Privacy Policy**") and Buyer has agreed that Buyer will comply fully with such Privacy Policy. Buyer and Seller agree that the sale of any personally identifiable information from Seller to Buyer under this Agreement shall be subject to, and consistent with, Seller's Privacy Policy. Buyer is buying an operating business of Seller. Buyer requires the personally identifiable

information to be transferred to the Buyer so that Buyer can continue to operate the Business and provide Seller's customers with the goods and services they have ordered from Seller (e.g., fulfill or renew newspaper subscriptions, process customer orders, deliver newspapers, deliver email alerts, etc.). Seller's Privacy Policy provides that personally identifiable information provided by a customer may be shared with third parties as is necessary to provide the customer requested services. The privacy policies specifically provides that "…information we collect, including personally identifiable information, will be shared with third parties who perform tasks required to complete the transaction, such as fulfilling subscription orders and processing credit card payments." The proposed sale is consistent with the Privacy Policy in that Buyer will be using the personally identifiable information to continue to provide customers with goods and services they have ordered, and further because Buyer has agreed to comply fully with the privacy policy.

**Section 7.13.     No Liability of Directors, Officers, etc.**  Buyer hereby waives any right to, and agrees not to pursue, any recourse against any of the officers, directors, shareholders, or trustees of Seller, or their respective Affiliates, with respect to the purchase and sale of the Purchased Assets, the assumption of the Assumed Liabilities, or any other matter related in any way to the Contemplated Transactions other than, in each case, any rights or recourse which arise as a result of the fraud or gross negligence of any such Persons.

**Section 7.14.     Vehicle Registration.**  Seller and Buyer shall arrange for the transfer of the registration of any registered trucks, cars, other vehicles, and rolling stock included in the Purchased Assets into Buyer's name.

**Section 7.15.     Remittance of Cash Received With Respect to the Purchased Assets.**  Seller and its Affiliates shall promptly remit to Buyer all cash payments it receives after Closing with respect to the Business or any Purchased Assets, except to the extent such cash payments are Excluded Assets.

**Section 7.16.     Covenants Related to Collections.**  Seller acknowledges and agrees that Buyer shall have the right and authority, subject to any prorations required hereunder, to collect for Buyer's own account all items which are included in the Purchased Assets. Buyer shall have the right and authority to retain and endorse without recourse the name of Seller on any check or any other evidence of indebtedness received by Buyer and representing Purchased Assets. Buyer acknowledges and agrees that Seller shall have the right and authority, subject to any prorations required hereunder, to collect for Seller's own account all items which are Excluded Assets.

**Section 7.17.     Transfer of Purchased Assets.**  If Buyer determines, after Closing, that any of the Purchased Assets were not transferred to Buyer at Closing, Seller shall, or shall cause the applicable Person to, provide Buyer with access to the facilities and locations where such Purchased Assets are located and Buyer shall be permitted to remove those Purchased Assets from the facilities at such time as reasonably requested by Buyer.

**Section 7.18.     Access to Books and Records**.  After Closing, Seller will cooperate with Buyer to make available to Buyer, under reasonable conditions, any pre-closing records of Seller that may be useful to Buyer in the ownership or operation of the Purchased Assets or the Business.  Seller, it its agreement with any other transferee of the assets of Seller, will make

Case 19-30223-tmb11    Doc 194    Filed 07/03/19

provision for such transferee to make available to Buyer, under reasonable conditions, any pre-closing records of Seller in the possession of such transferee that may be useful to Buyer in the ownership or operation of the Purchased Assets or the Business.

**Section 7.19.    Business Names**.  Upon the Closing, the Seller and each of its Affiliates will cease all use of the Business Names.

**Section 7.20.    Sales Order**.  The Seller shall request that the proposed Sales Order include, among other things:

(a)    That this Agreement was negotiated at arm's length, and Buyer has acted in good faith and without collusion or fraud of any kind;

(b)    Buyer is not an "insider" or "affiliate" of Western as those terms are defined in the Bankruptcy Code;

(c)    neither Western nor Buyer have engaged in any conduct that would prevent the application of Section 363(m) of the Bankruptcy Code or cause the application of Section 363(n) of the Bankruptcy Code with respect to the consummation of the purchase transaction;

(d)    Buyer is purchasing the Purchased Assets in good faith within the meaning of Section 363(m) of the Bankruptcy Code and is entitled to the protections afforded by Section 363(m) of the Bankruptcy Code;

(e)    Notice of the sale (and any required sale procedures), as sent to all creditors and interested parties, is sufficient to comply with notice requirements of the Bankruptcy Code;

(f)    All objections to the sale free and clear of liens, Claims, interests, and encumbrances have been withdrawn or overruled, and Buyer therefore purchases from Western the Purchased Assets free and clear of all liens, Claims, interests, and encumbrances, including free and clear of the Liens and Liabilities, other than Permitted Liens and Assumed Liabilities; and

(g)    Buyer is released from any potential liability in connection with the purchase of the Purchased Assets, other than Permitted Liens and Assumed Liabilities.

## ARTICLE 8
## EMPLOYEE MATTERS

**Section 8.1.    Employees**

(a)    Effective as of the end of business on the day immediately prior to the Closing Date, Seller shall terminate all Business Employees. Prior to the Closing Date, Buyer shall deliver, in writing, an offer of employment to those Business Employees identified by Buyer on a schedule to be delivered to Seller no later than five Business Days prior to Closing to commence such employment immediately upon the Closing Date.  Such individuals who accept such offer by the Closing Date are hereinafter referred to as the "**Transferred Employees**." Subject to Legal Requirements, on and after the Closing Date, Buyer shall have the right to

Case 19-30223-tmb11    Doc 194    Filed 07/03/19

dismiss any or all Transferred Employees at any time, with or without cause, reassign, promote, demote or take any other employment action with respect to any Transferred Employee, including changing adversely or favorably the titles, powers, duties, responsibilities, functions, locations, salaries, other compensation, or the terms and conditions of employment of any Transferred Employee (including compensation and employee benefits provided to them). Seller shall cooperate with and shall not impair, interfere with, or frustrate Buyer's efforts to offer and secure the employment of any Business Employees. Notwithstanding the above, Buyer shall assume all accrued holiday leave, sick leave, vacation leave or other leave benefits for all employees hired by Buyer, that would be payable by Seller upon termination of employment at Closing, and in connection therewith Buyer will credit each employee with all such earned but unused accrued leave. In turn, Buyer will receive a corresponding credit at Closing against the Purchase Price for the assumption of such earned but unused accrued leave. Sellers will comply with all Legal Requirements with respect to all employees of the Business that are not Transferred Employees.

(b)     Buyer may advertise, recruit, and offer employment to such individuals as it determines in its sole discretion. This <u>Section 8.1</u> does not constitute any commitment or understanding (expressed or implied) of any obligation on Buyer's part to: (i) offer employment to or to hire any of the employees of the Business, or (ii) hire any such employees for a fixed term or duration or upon any terms or conditions other than those that Buyer establishes pursuant to individual offers of employment.

(c)     Except as expressly set forth in any offer of employment, Buyer will have no responsibility for, and Seller will be solely responsible for, any wages, compensation, bonuses, deferred compensation, liabilities for all accrued vacation and personal days, overtime, profit sharing benefits, workers' compensation, sick pay, and severance pay benefits accrued through and including the Closing Date. No such responsibility or obligation will constitute an Assumed Liability.

**Section 8.2.     Employee Benefits.**

(a)     Seller will retain all of the liabilities under all Employee Plans. Buyer is not assuming, and will not have any responsibility for, the continuation of, or any liability under or in connection with any Employee Plans, except as otherwise provided in <u>Section 8.3</u>. Claims, if any, of employees of the Business and their eligible beneficiaries and dependents for medical, dental, prescription drug, life insurance, disability, vacation, paid time off and other welfare benefits that are incurred during Seller's period of operations before the Closing Date shall be the sole responsibility of Seller and the Employee Plans. In addition, Seller shall remain responsible for the administration and financial obligation of all workers' compensation claims of Transferred Employees arising out of or relating to occurrences before the Closing Date.

(b)     As soon as practicable after the Closing, Seller shall take all steps necessary or desirable to ensure that all amounts owed under any Employee Plan for time periods prior to the Closing Date have been fully paid or satisfied.

**Section 8.3.     COBRA Obligations.** Notwithstanding anything to the contrary in this Agreement, Seller shall retain all its Liabilities, and Buyer shall have no Liability, with respect to

the provision of notices, election periods, and benefits pursuant to Section 4980B of the Code or Part 6 of Subtitle B of Title 1 of ERISA ("**COBRA**"), to any employee of Seller or any other former employees of Seller or other individuals associated with any employee of the Business or any other former employees of Seller with respect to qualifying events occurring on or before Closing Date or in connection with the Contemplated Transactions. As soon as reasonably practicable after the Closing Date, Seller shall notify the Business Employees that, effective as of the Closing Date, they shall be eligible to elect COBRA coverage. Notwithstanding the foregoing, in the event that Seller ceases to offer health care coverage, Buyer shall take all reasonable actions to ensure that COBRA coverage shall be available to employees of the Business and their qualified beneficiaries who are eligible for COBRA coverage, effective as of the later of (a) Closing Date and (b) the date Seller ceases to offer health care coverage.

### Section 8.4. Expenses

(a) Except for the Assumed Liabilities, Seller will be responsible for all expenses, costs, and other Liabilities incurred by Seller during its operation of the Business and the Purchased Assets owned by it that are required to be paid in connection with the employment and/or termination of employment of any employee of Seller prior to or in connection with Closing.

(b) Except as otherwise expressly provided in this Agreement, Seller acknowledges and agrees that Seller maintains responsibility for paying and providing to its employees all wages, salaries, and other incentives or benefits relating to the employees' terms and conditions of employment during Seller's period of operating the Business or its ownership of the Purchased Assets prior to and including the Closing Date.

### ARTICLE 9
### CONDITIONS TO CLOSING

**Section 9.1. Conditions to Obligations of Seller.**  The obligations of Seller to consummate the Contemplated Transactions shall be subject to the fulfillment or written waiver (in whole or in part) by Seller, at or prior to Closing, of each of the following conditions:

(a) no Governmental Body shall have enacted, issued, promulgated, enforced, or entered any Legal Requirement or Order (whether temporary, preliminary, or permanent) that has the effect of making the Contemplated Transactions illegal or otherwise restraining or prohibiting the consummation of the Contemplated Transactions.

(b) the Bankruptcy Court shall have entered the Sale Order.

(c) Buyer shall have duly executed and delivered to Seller each document, instrument, and agreement required to be delivered under Section 4.2(b).

(d) all representations and warranties made by Buyer in this Agreement shall be true and correct in all material respects on and as of the Closing Date as if again made by Buyer on and as of such date (or, if made as of a specific date, at and as of such date), except that those representations and warranties made by Buyer that contain materiality or other similar qualifiers shall be true and correct in all respects.

(e)     Buyer shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date (except with respect to the obligation to pay the Purchase Price in accordance with the terms of this Agreement, which obligation shall be performed in all respects as required under this Agreement.

(f)     Buyer and Seller shall agree on the form and substance of each exhibit and schedule required under this Agreement to be completed at or prior to Closing.

(g)     Buyer and Seller shall, on or prior to Closing, have entered into the Bend Lease.

**Section 9.2.     Conditions to Obligations of Buyer.**  The obligations of Buyer to consummate the Contemplated Transactions shall be subject to the fulfillment or written waiver (in whole or in part) by Buyer, at or prior to Closing, of each of the following conditions:

(a)     the Bankruptcy Court shall have entered the Sale Order, each in form and substance reasonably satisfactory to Buyer, and the Sale Order shall, at the option of Buyer, have become a Final Order

(b)     no Governmental Body shall have enacted, issued, promulgated, enforced, or entered any Legal Requirement or Order (whether temporary, preliminary, or permanent) that has the effect of making the Contemplated Transactions illegal or otherwise restraining or prohibiting the consummation of the Contemplated Transactions.

(c)     Seller shall have duly executed, as required, and delivered to Buyer each document, instrument, and agreement required to be delivered under <u>Section 4.2(a)</u>.

(d)     all representations and warranties made by Seller in this Agreement shall be true and correct in all material respects on and as of the Closing Date as if again made by Seller on and as of such date (or, if made as of a specific date, at and as of such date), except that those representations and warranties made by Seller that contain materiality or other similar qualifiers shall be true and correct in all respects.

(e)     Seller shall have performed in all material respects all obligations under this Agreement to be performed by them on or before the Closing Date.

(f)     there has occurred no Material Adverse Change in the Purchased Assets since the Effective Date.

(g)     Buyer and Seller shall, on or prior to Closing, have entered into the Bend Lease.

(h)     Buyer and Sellers shall agree on the form and substance of each exhibit and schedule required under this Agreement to be completed at or prior to Closing.

### ARTICLE 10
### BANKRUPTCY SPECIFIC PROVISIONS

**Section 10.1.**     Seller and Buyer acknowledge that this Agreement and the sale of the Purchased Assets are subject to Bankruptcy Court approval.  Seller and Buyer acknowledge that

(a) to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets, including, but not limited to, giving notice of the transactions contemplated by this Agreement to creditors and certain other interested parties; and (b) Buyer must pay the Cure Costs for all Assumed Contracts, cure all defaults, and provide adequate assurance of future performance under the Assumed Contracts. Further, Seller and Buyer acknowledge that the Bankruptcy Court may order an auction process for the sale of the Purchased Assets.

(a) If Buyer is not the successful purchaser and an Alternative Transaction is approved by the Bankruptcy Court, Buyer will be entitled to a return of the Deposit and, subject to Bankruptcy Court approval, will be entitled to receive a cash payment in the amount of Sixty-Seven Thousand, Five-Hundred U.S. dollars ($67,500) (the **"Break-Up Fee"**);

(b) Competing bidders will be required to overbid as follows: The first competing bidder must bid an initial amount of at least One Hundred Thousand U.S. dollars ($100,000.00) in cash over the Purchase Price. Any subsequent bidder, including Buyer, must bid in bid increments of at least Fifty Thousand U.S. dollars ($50,000.00) over the most recently submitted bid. Buyer shall be entitled to credit bid, at each round of the auction, the amount of the Break-Up Fee.

(c) Competing bidders must demonstrate the ability to pay the Purchase Price in cash at Closing;

(d) Competing bidders (other than Buyer) will be required to deposit the sum of Sixty-Seven Thousand, Five Hundred U.S. dollars ($67,500) in cash (to cover the Break-Up Fee) and an additional deposit of 10% of their proposed purchase price, and deliver to Seller a signed copy of this Agreement, marked to show such bidder's proposed changes, in order to confirm a commitment to proceed with the purchase; and

(e) To determine the highest and best offer between this Agreement and competing bids that include the Purchase Assets and assets of the Seller for the printing, publishing and distribution of newspapers other than the Business (each, a "**Newspaper Business**"), the Seller shall require such competing bidders to allocate the proposed purchase price among each Newspaper Business. If a competing bidder's allocated purchase price for the Purchased Assets is less than the Purchase Price, the Seller shall present this Agreement as the highest and best offer to the Bankruptcy Court.

## ARTICLE 11
## GENERAL PROVISIONS

**Section 11.1.     Expenses.** Except as otherwise provided in this Agreement, each party to this Agreement will bear its respective fees and expenses incurred in connection with the preparation, negotiation, execution, closing, and performance of this Agreement and the Contemplated Transactions, including all fees and expenses of its representatives.

**Section 11.2.     Public Announcements**. Neither party to this Agreement shall make, or cause to be made, any press release or public announcement in respect of this Agreement or the Contemplated Transactions, or otherwise communicate with any news media without the prior

written consent of the other party, except as otherwise required by Legal Requirements, applicable stock exchange regulations, or in filings in the Bankruptcy Court or the office of the United States Trustee.  The parties shall cooperate as to the timing and contents of any such press release, public announcement, or communication.

     **Section 11.3.**    **Notices.**  All notices, consents, waivers, and other communications required or permitted by this Agreement shall be in writing and shall be deemed given to a party when (a) delivered to the addresses indicated below by hand or by nationally recognized overnight courier service (costs prepaid); (b) sent by facsimile or email with confirmation of transmission by the transmitting equipment; or (c) received or rejected by the addressee, if sent by certified mail, return receipt requested, in each case to the following addresses, facsimile numbers, or email addresses and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number, email address, or person as a party may designate by notice to the other parties):

|  |  |
|---|---|
| **SELLER** | Western Communications, Inc. |
|  | 1777 SW Chandler Avenue |
|  | Bend, OR 97702 |
| Attention: | Betsy McCool |
| Fax No: | 541-385-5802 |
| Email Address: | Bfhmccool@aol.com |
|  |  |
| **With a copy to:** | Tonkon Torp LLP |
|  | 1600 Pioneer Tower |
|  | 888 SW Fifth Avenue |
|  | Portland, OR 97204 |
| Attention: | Michael W. Fletcher |
| Fax No: | 503-972-3869 |
| Email Address: | Michael.fletcher@tonkon.com |
|  |  |
| **BUYER:** | Rhode Island Suburban Newspapers Inc. |
|  | Suite 920-1200 West 73rd Avenue |
|  | Vancouver, British Columbia V6P 6G5 |
|  | Canada |
| Attention: | Steven Malkowich |
| Fax No: | (604) 732-4094 |
|  | smalkowich@angi.ca |
|  |  |
| **With a copy to:** | Barack, Ferrazzano Kirschbaum & |
|  | Nagelberg LLP |
|  | 200 West Madison, Suite 3900 |
|  | Chicago, IL  60062 |
| Attention: | Alexander Lourie; Brandon Knop |
| Fax No: | (312) 984-3150 |
| Email Address: | alexander.lourie@bfkn.com; |
|  | brandon.knop@bfkn.com |

**Section 11.4.     Waiver; Remedies Cumulative.**  The rights and remedies of the parties to this Agreement are cumulative and not alternative.  Neither any failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege, or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable Legal Requirements (a) no waiver that may be given by a party will be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one party will be deemed to be a waiver of any obligation of that party or of the right of the party giving such notice or demand to take further action, without notice or demand, as provided in this Agreement or the documents referred to in this Agreement.

**Section 11.5.     Entire Agreement and Modification.**  This Agreement supersedes all prior agreements, whether written or oral, between the parties with respect to its subject matter (including any letter of intent and any confidentiality agreement between Buyer and Seller) and constitutes (along with the schedules, exhibits, and other documents delivered pursuant to this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter.  This Agreement may not be amended, supplemented, or otherwise modified except by a written agreement executed by the party to be charged with the amendment.

**Section 11.6.     Schedules.**  The statements in the Schedules relate to the provisions in the sections of this Agreement to which they expressly relate and to any other section to which the relevance of the disclosure is reasonably apparent.

**Section 11.7.     Assignments, Successors, and No Third-Party Rights.**  No party may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other party or by Order of the Bankruptcy Court, provided that nothing contained herein shall prevent Rhode Island Suburban Newspaper Inc. from assigning all of its rights and liabilities to an Affiliate prior to Closing.  Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of the successors and permitted assigns of the parties.  Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement, except such rights as shall inure to a successor or permitted assignee pursuant to this Section 11.7.

**Section 11.8.     Severability.**  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**Section 11.9.     Time of Essence.**  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

**Section 11.10.   Governing Law.**  This Agreement will be governed by and construed under the laws of the State of Oregon, without regard to conflict of laws principles that would require the application of any other Legal Requirements and, to the extent applicable, the Bankruptcy Code.  Each party hereby consents to the jurisdiction of the Bankruptcy Court and courts of the State of Oregon for purposes of construing and enforcing the rights created herein. During the pendency of the Bankruptcy Case, any proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may only be brought against any of the parties in the Bankruptcy Court, and the parties consent to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts) in any such action or proceeding, and waive any objection to the venue laid therein.

**Section 11.11.   Usage.**  In this Agreement, unless a clear contrary intention appears:

(a)     the singular number includes the plural number and vice versa;

(b)     reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are not prohibited by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually;

(c)     reference to any gender includes each other gender;

(d)     reference to any agreement, document, or instrument means such agreement, document, or instrument as amended or modified and in effect from time to time in accordance with the terms thereof;

(e)     reference to any Legal Requirement means such Legal Requirement as amended, modified, codified, replaced, or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder, and reference to any section or other provision of any Legal Requirement means that provision of such Legal Requirement from time to time in effect and constituting the substantive amendment, modification, codification, replacement, or reenactment of such section or other provision;

(f)     "hereunder," "hereof," "hereto," and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Article, Section, or other provision hereof;

(g)     "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term;

(h)     "or" is used in the inclusive sense of "and/or;"

(i)     "will" and "shall" have the same meaning;

(j)     the headings of Articles and Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation;

(k)     references to "Articles," "Sections," "Exhibits" and "Schedules" refer to the corresponding Articles, Sections, Exhibits and Schedules of this Agreement;

(l)     with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding;" and

(m)     references to documents, instruments, or agreements shall be deemed to refer as well to all addenda, exhibits, schedules, or amendments thereto.

**Section 11.12.   Execution of Agreement.**  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. The exchange of copies of this Agreement and of signature pages by facsimile or electronic transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the parties transmitted by facsimile or electronically shall be deemed to be their original signatures for all purposes.

**ARTICLE 12**
**TERMINATION**

**Section 12.1.    Right of Termination.**  Notwithstanding anything to the contrary contained herein, this Agreement may be terminated only as provided in this <u>Article 12</u>.  In the case of any such termination, the terminating party shall give notice to the other party specifying the provision pursuant to which the Agreement is being terminated.  This Agreement may be terminated at any time before Closing:

(a)     by mutual written consent of Seller and Buyer;

(b)     by either Buyer or Seller if the Bankruptcy Court approves an Alternative Transaction, or an Alternative Transaction is consummated;

(c)     by either Buyer or Seller if Closing does not occur on or before August 30, 2019 (the "**Outside Date**"); provided, however, that the right to terminate this Agreement under this Section shall not be available to any party whose breach (or whose Affiliate's breach) of this Agreement has resulted in the failure of Closing to occur on or before the Outside Date;

(d)     by either Buyer or Seller if any Governmental Body shall have issued any permanent Order enjoining or otherwise prohibiting the transactions contemplated hereby and all appeals and means of appeal therefrom have been exhausted;

(e)     by Buyer, if Seller shall have materially breached any of its representations, warranties, covenants, or agreements contained herein and such breach shall not have been cured within 15 days after receipt by Seller from Buyer of written notice of such breach (provided, however, that no such cure period shall be available or applicable to any such breach which by its nature cannot be cured) and if not cured within the timeframe above and at or prior to Closing, such breach (individually or together with all other breaches by Seller) would result in the failure of any of the conditions set forth in <u>Section 9.2</u> to be satisfied; or

(f)     by Buyer if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement, or a trustee is appointed for Seller and such Trustee rejects the transaction contemplated by this Agreement;

(g)     by Buyer, if any of the conditions specified in <u>Section 9.2</u> shall not have been met or waived prior to such time as such condition can no longer be satisfied;

(h)     by Seller if Buyer has not timely made the Deposit;

(i)     by Seller, if Buyer shall have materially breached any of its or his representations, warranties, covenants, or agreements contained herein and such breach shall not have been cured within 15 days after receipt by Buyer from Seller of written notice of such breach (provided, however, that no such cure period shall be available or applicable to any such breach which by its nature cannot be cured) and if not cured within the timeframe above and at or prior to Closing, such breach (individually or together with all other breaches by Buyer) would result in the failure of any of the conditions set forth in <u>Section 9.1</u> to be satisfied; or

(j)     by Seller, if any of the conditions specified in <u>Section 9.1</u> shall not have been met or waived prior to such time as such condition can no longer be satisfied.

(k)     by Buyer, if Closing does not occur within 20 days after the entry of a Sale Order by the Bankruptcy Court.

**Section 12.2.     Effect of Termination**.  The right of termination provided in <u>Section 12.1</u> is in addition to any other rights and remedies a party may have under this Agreement, applicable Legal Requirements, or otherwise.  In the event of termination of this Agreement as provided in <u>Section 12.1</u>, this Agreement shall become void and there shall be no liability or obligation on the part of Buyer, Seller, or their respective officers, directors, shareholders, or Affiliates; provided, however, that (a) the provisions of this <u>Section 12.2</u>, <u>Section 12.3</u>, and Article 12 shall remain in full force and effect and survive any termination of this Agreement; and (b) nothing herein shall relieve any party hereto from liability in connection with any willful breach of such party's representations, warranties, covenants, or agreements contained herein.

**Section 12.3.     Disbursement of Deposit**

(a)     <u>Disbursement of Deposit Upon Closing</u>**.**  If Closing is completed, then the Deposit will be applied against the Purchase Price at Closing.

(b)     <u>Disbursement of Deposit to Seller</u>**.**  If Closing does not occur as a result of termination by Seller due to a breach or default by Buyer, then Seller shall retain the Deposit as liquidated damages.

(c)     <u>Disbursement of Deposit to Buyer</u>**.**  If Closing does not occur, and this Agreement is terminated for any reason other than termination by Seller due to a breach or default by Buyer, then Buyer shall, except as may otherwise be ordered by the Bankruptcy Court, cause the Deposit to be returned to Seller.

Case 19-30223-tmb11    Doc 194    Filed 07/03/19

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**SELLER:**                                    **BUYER:**

WESTERN COMMUNICATIONS, INC.        RHODE ISLAND SUBURBAN
                                               NEWSPAPERS INC.

By _____          By _____

Name _____          Name _____
     Elizabeth C. McCool                        Steven Malkowich

Title _____          Title _____
         Chairwoman                              Executive Vice President

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**SELLER:**                                    **BUYER:**

WESTERN COMMUNICATIONS, INC.        RHODE ISLAND SUBURBAN
                                                NEWSPAPERS INC.

By _____         By _____

Name _____         Name ___Steven Malkowich_____

Title _____         Title ___Executive Vice President___

# EXHIBIT A TO BEND ASSET PURCHASE AGREEMENT

## DEFINITIONS

When used in this Agreement, the following terms and variations thereof have the following meanings:

"**Accounts Receivable**" means (a) all trade accounts receivable and other rights to payment, and the full benefit of all security for such accounts or rights to payment, representing amounts receivable in respect of goods shipped or products sold or services rendered by Seller in connection with the Business prior to Closing; and (b) any claim, remedy, or other right related to any of the foregoing.

"**Additional Assets**" has the meaning given in Section 2.1(q).

"**Affiliate**" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the "controlled" Person, whether through ownership of voting securities, by contract or otherwise.

"**Allocation**" has the meaning given in Section 3.4.

"**Alternative Transaction**" means the sale, transfer, or other disposition, directly or indirectly, including through an asset sale, share or stock sale, merger, amalgamation, or other similar transaction, including a plan of reorganization approved by the Bankruptcy Court or resulting from an auction of a material portion of the Purchased Assets in a transaction or series of transactions with one or more individuals or entities other than Buyer

"**Ancillary Agreements**" means such other instruments or agreements, in form and substance and in registrable or recordation form where applicable, reasonably satisfactory to Buyer, as may be reasonably requested by Buyer to effect the transfer of the Purchased Assets to Buyer and the consummation of the Contemplated Transactions, or to register or record or evidence such transfer (including on the public records), and any other instrument or agreement contemplated by this Agreement or the foregoing.

"**Assignment and Assumption Agreement**" has the meaning given in Section 4.2(a)(iii).

"**Assumed Contracts**" has the meaning given in Section 2.1(h).

"**Assumed Liabilities**" has the meaning given in Section 2.3(a).

"**Bankruptcy Code**" has the meaning given in the Recitals.

"**Bankruptcy Court**" has the meaning given in the Recitals.

"**Bill of Sale**" has the meaning given in <u>Section 4.2(a)(ii)</u>.

"**Break-Up Fee**" has the meaning given in <u>Section 10.5(b).</u>

"**Business**" has the meaning given in the Recitals.

"**Business Day**" means any day other than (a) Saturday or Sunday or (b) any other day on which banks in Portland, Oregon are permitted or required to be closed.

"**Business Employees**" means those employees of the Seller that are engaged in performing services for the Business as of the date hereof, including those employees who are identified as "Business Employees" specifically identified on a schedule to be mutually agreed by Buyer and Sellers at or prior to Closing.

"**Business Names**" means "The Bulletin", "Redmond Spokesman", "TMC", "Go!", "Bend Homes", "Area 97", "Pulse" and any substantially similar names, indicia, acronyms or abbreviations thereof.

"**Claim**" has the meaning provided in Section 101(5) of the Bankruptcy Code.

"**Closing**" has the meaning given in <u>Section 4.1</u>.

"**Closing Date**" has the meaning given in <u>Section 4.1</u>.

"**Closing Date Payment**" has the meaning given in <u>Section 3.2(d)</u>.

"**COBRA**" has the meaning given in <u>Section 8.3</u>.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Confidentiality Agreement**" has the meaning given in <u>Section 7.5</u>.

"**Contemplated Transactions**" has the meaning given in the Recitals.

"**Contract**" means any contract, arrangement, bond, commitment, purchase order, sales order, franchise, guarantee, indemnity, indenture, instrument, lease, license or other agreement, understanding, instrument or obligation, whether written or oral, all amendments, supplements and modifications of or for any of the foregoing any all rights and interests arising thereunder or in connection therewith.

"**Conveyance Taxes**" means all sales, use, value added, transfer, stamp, stock transfer real property transfer and similar Taxes.

"**Cure Costs**" means the amount determined in a finding by the Bankruptcy Court in a Final Order required to be paid to cure any outstanding defaults under an Assumed Contract so that Seller may assign such Contract to Buyer pursuant to Section 365 of the Bankruptcy Code, and shall include any fees or out of pocket expenses accrued during a Permitting Process. Upon objection by the non-debtor party to any such Assumed Contract, Seller shall either settle the

objection of such party or shall litigate such objection under such procedures as the Bankruptcy Court shall approve and proscribe.

"**Deposit**" has the meaning given in <u>Section 3.2(a)</u>.

"**Employee Plans**" means the employee benefit plans of Seller existing prior to the Closing Date.

"**Excluded Assets**" has the meaning given in <u>Section 2.2</u>.

"**Excluded Contract**" means every Contract held by the Seller, other than the Assumed Contracts.

"**Facilities**" means the leased or owned office, manufacturing and sales facilities of Seller used in connection with the Business. For purposes of identification only and not for purposes of defining Purchased Assets or Assumed Liabilities, the street address of the Facilities is 1777 SW Chandler Avenue Bend, OR 97702.

"**Final Order**" means an order, judgment or other decree of the Bankruptcy Court or any other court or judicial body with proper jurisdiction, as the case may be, which is in full force and effect and which has not been reversed, stayed, modified or amended.

"**Finished Goods**" means all finished goods relating to the Business as of Closing Date, and any prepaid deposits for any of the same.

"**GAAP**" means United States generally accepted accounting principles, as in effect on the Effective Date, applied on a consistent basis in accordance with Seller's historical methods, policies, practices, estimations, and judgments, including materiality standards, adjustments, and reserve levels.

"**Governmental Body**" means any: (a) nation, state, county, city, town, borough, village, district or other jurisdiction; (b) federal, state, local, municipal, foreign or other government; (c) governmental or quasi-governmental authority of any nature (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers); (d) multinational organization or body; (e) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power or (g) official of any of the foregoing.

"**Intellectual Property Rights**" means: (a) patents, including reissued and reexamined patents and extensions corresponding thereto, and patent applications, including continuation, continuation in part and divisional applications and patents issuing therefore; (b) trademarks, service markets, trade names, trade dress and Internet domain names, together with the goodwill associated therewith, and registrations and applications of registrations thereof; (c) copyrights including copyrights in computer software and registrations and applications for registration thereof and (d) trade secrets and confidential and proprietary information.

"**Inventory**" means all Finished Goods, inventory, prepaid inventory, merchandise, work in progress, residual by-products, samples, supplies, spare parts, shipping materials, packaging

materials, raw materials and other consumables relating primarily to the Business and maintained, held or stored by or for Seller and located at the Facilities as of Closing Date.

"**IP Assignment and License**" has the meaning given in <u>Section 4.2(a)(iv)</u>.

"**IRS**" means the United States Internal Revenue Service.

"**Legal Requirement**" means any federal, state, local, municipal, foreign, international, multinational or other constitution, law, ordinance, principle of common law, code, regulation, statute or treaty of any Governmental Body.

"**Liability**" means with respect to any Person, any debt, liability, commitment, duties, responsibilities or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person.

"**Lien**" means any charge, claim, community or other marital property interest, condition, equitable interest, lien, option, pledge, security interest, mortgage, right of way, easement, encroachment, encumbrance, servitude, right of first option, right of first refusal or similar restriction, including any restriction on use, transfer, receipt of income or exercise of any other attribute of ownership.

"**Material Adverse Change**" means materially adverse facts or conditions previously unknown by and not disclosed to Buyer that would substantially impair Buyer's ability to operate the Purchased Assets.

"**Material Adverse Effect**" applies only to the disclosure provisions of the Agreement and means any circumstance, change in, or effect on a party, its subsidiaries, and its business, taken as a whole, that (i) either (A) is materially adverse to the operations, assets and liabilities (taken together), earnings or results of operations, or condition of the business (financial or otherwise) of such party and its subsidiaries, taken as a whole, or (B) would reasonably be expected to prevent the ability of such party to consummate the transactions contemplated by this Agreement, and (ii) is not cured within a reasonable period of time following notice from the party claiming the occurrence or circumstance that is materially adverse as to the business, properties, assets, liabilities, operations, operating condition (financial or otherwise) of the party; provided, however, that such term shall not include any circumstance or change related to (s) general economic or political conditions, (t) conditions generally affecting the industries in which the Business operates, (u) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Buyer; (v) any matter of which Buyer is aware on the date hereof; (w) any changes in applicable Legal Requirements or accounting rules (including GAAP); (x) the announcement, pendency or completion of the Bankruptcy Case or the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with Seller and the Business (y) any act of God, war, terrorism, or other similar event beyond the control of the party that does not directly and peculiarly impact the

assets or premises of the party, or (z) credit markets, securities markets or the economy, unrelated to any event that would otherwise constitute a Material Adverse Effect on the party.

"**Order**" means any order, injunction, judgment, decree, ruling, writ, assessment or award of any Governmental Body, any conciliation agreement, settlement agreement, market conduct or financial examination report, corrective action plan or other similar agreement with any Governmental Body (including cease-and-desist or other orders) and any award in any arbitration proceeding including any Order entered into by the Bankruptcy Court.

"**Permits and Licenses**" has the meaning given in Section 2.1(i).

"**Permitting Process**" has the meaning given in Section 7.6.

"**Permitted Lien**" means (i) Liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures, and (ii) mechanics', carriers', workmen's, repairmen's or other like Liens arising or incurred in the ordinary course of business.

"**Person**" means an individual, partnership, corporation, business trust, limited liability company, limited liability partnership, joint stock company, trust, unincorporated association, joint venture or other entity or a Governmental Body.

"**Property Taxes**" means real and personal ad valorem property Taxes and any other Taxes imposed on a periodic basis and measured by the value of any item of property.

"**Purchase Price**" has the meaning given in Section 3.1.

"**Purchased Assets**" has the meaning given in Section 2.1.

"**Retained Liabilities**" has the meaning given in Section 2.3(b).

"**Sale Order**" means the Order of the Bankruptcy Court, in form and substance reasonably acceptable to Seller and Buyer, authorizing the Contemplated Transactions and, on Closing vesting in Buyer all of Seller's right, title, and interest in and to the Purchased Assets owned by it, free and clear of all Claims, encumbrances, interests, and Liens, except for Permitted Liens or Liens to be released at or prior to or in connection with Closing. For the avoidance of doubt, the Sale Order shall not vest in Buyer any right, title or interest in the Excluded Assets or impose and assign any obligation with respect to the Retained Liabilities.

"**Tax**" means any income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental, windfall profit, customs, vehicle, airplane, boat, vessel or other title or registration, capital stock, franchise, employees' income withholding, foreign or domestic withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, value added, alternative, add-on minimum and other tax, fee, assessment, levy, tariff, charge or duty of any kind whatsoever and any interest, penalty, addition or additional amount thereon imposed, assessed or collected by or under the authority of any Governmental Body or payable under any tax-sharing agreement or any other Contract or as a result of being a transferee of, or a successor in interest to, any Person or as a result of any express or implied obligation to indemnify any Person..

"**Tax Return**" means any return (including any information return), report, statement, schedule, notice, form, declaration, claim for refund or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of or compliance with any Legal Requirement relating to any Tax.

"**Trademarks**" has the meaning given in Section 2.1(n).

"**Transferred Employees**" has the meaning given in Section 8.1(a).

**EXHIBIT 4.2(a)(ii) TO BEND ASSET PURCHASE AGREEMENT**

**FORM OF BILL OF SALE AND INSTRUMENT OF
ASSIGNMENT OF ASSETS AND ASSUMPTION OF LIABILITIES**

BILL OF SALE AND INSTRUMENT OF ASSIGNMENT OF ASSETS AND ASSUMPTION OF LIABILITIES, dated as of [_____ , 2019] (this "Bill of Sale and Instrument of Assignment and Assumption"), from Western Communications, Inc., an Oregon corporation, as debtor and debtor-in-possession ("Seller"), to [_____], a [_____] ("Buyer").

WHEREAS, Seller and Buyer have entered into that certain Bend Asset Purchase Agreement, dated as of July 3, 2019 (the "Asset Purchase Agreement;" unless otherwise defined herein, capitalized terms shall be used herein as defined in the Asset Purchase Agreement), pursuant to which Seller has agreed to sell, assign, and transfer to Buyer, and Buyer has agreed to purchase and acquire from Seller, the Purchased Assets, and Buyer has agreed to assume the Assumed Liabilities; and

WHEREAS, the execution and delivery of this Bill of Sale and Instrument of Assignment and Assumption by Seller is required by Section 4.2(a) of the Asset Purchase Agreement;

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in the Asset Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer do hereby agree as follows:

**1.        Sale and Assignment of Assets and Properties**.  On the terms and subject to the conditions set forth in the Asset Purchase Agreement, Seller hereby sells, assigns, transfers, conveys and delivers unto Buyer and its successors and assigns, forever, the entire right, title, and interest of Seller free and clear of all Liens in and to the Purchased Assets, other than Permitted Liens.

**2.        Assumption of Assumed Liabilities**.  On the terms and subject to the conditions set forth in the Asset Purchase Agreement, Buyer hereby assumes, and agrees to timely pay, perform, and discharge in accordance with their terms, the Assumed Liabilities.

**3.        Further Action**. Seller shall, at the request of Buyer, use their reasonable best efforts to timely execute and deliver any additional documents and perform such additional acts that may be necessary, proper and advisable under applicable Legal Requirement to grant, sell, convey, assign, transfer, set over to or vest in Buyer any of the Purchased Assets.

**4.        No Third Party Beneficiaries**. This Bill of Sale and instrument of Assignment and Assumption shall be binding upon and inure solely to the benefit of the parties to the Asset Purchase Agreement and their respective successors and assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person, any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Bill of Sale and Instrument of Assignment and Assumption.

Case 19-30223-tmb11    Doc 194    Filed 07/03/19

5.    **Interpretation**.  The respective rights of Seller, on the one hand, and Buyer, on the other, with respect to the Purchased Assets sold, transferred, assigned and conveyed hereby and the assumption of the Assumed Liabilities hereunder shall be governed exclusively by the Asset Purchase Agreement and the Sale Order, and nothing in this Bill of Sale and Instrument of Assignment and Assumption shall alter any liability or obligations arising under the Asset Purchase Agreement, which shall (without limiting the generality of the foregoing) govern, and shall contain the sole and exclusive representations, warranties and obligations of the parties with respect to the rights and obligations sold, transferred, assigned, conveyed and assumed hereunder. If there is any conflict or inconsistency between the provisions of the Asset Purchase Agreement and this Bill of Sale and Instrument of Assignment and Assumption, the provisions of the Asset Purchase Agreement shall govern.

6.    **Governing Law**.  This Bill of Sale and Instrument of Assignment and Assumption will be governed by and construed under the laws of the State of Oregon, without regard to conflicts-of-laws principles that would require the application of any other Legal Requirements, and to the extent applicable, the Bankruptcy Code.

7.    **Counterparts**.  This Bill of Sale and Instrument of Assignment and Assumption may be executed and delivered (including by facsimile transmission) in counterparts, and by the different parties hereto in separate counterparts, each of when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

IN WITNESS WHEREOF, this Bill of Sale and Instrument of Assignment and Assumption has been duly executed as of the date first above written.

**SELLER:**

WESTERN COMMUNICATIONS, INC.

By _____

Name _____

Title _____

PAGE 2 – EXHIBIT 4.2(a)(ii) - FORM OF BILL OF SALE AND INSTRUMENT
    OF ASSIGNMENT OF ASSETS AND ASSUMPTION OF LIABILITIES
    ASSET PURCHASE AGREEMENT

Case 19-30223-tmb11    Doc 194    Filed 07/03/19

**EXHIBIT 4.2(a)(iii) TO BEND ASSET PURCHASE AGREEMENT**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

This Assignment and Assumption Agreement (this "Assignment"), dated as of [_____, 2019], is between Western Communications, Inc., an Oregon corporation as debtor and debtor-in-possession ("Assignor"), and [_____], a [_____] ("Assignee").

This Assignment is executed and delivered pursuant to the Bend Asset Purchase Agreement, dated as of July 3, 2019 (the "Asset Purchase Agreement"), between Assignor and Assignee.  Under the Asset Purchase Agreement, Assignor agreed to transfer certain contracts to Assignee, and Assignee agreed to assume certain liabilities from Assignor.

Assignor and Assignee therefore agree as follows:

1.      Each initially capitalized term not otherwise defined in this Assignment will have the meaning given in the Asset Purchase Agreement.

2.      Assignor hereby assigns to Assignee all of Assignor's rights, title, and interest in and to the Assumed Contracts.

3.      Assignee (a) accepts the assignment of the Assumed Contracts and assumes, after the Closing Date, all of Assignor's obligations that first accrue after the Closing Date pursuant to each Assumed Contract and (b) will be bound by the terms of each Assumed Contract and will perform all requirements thereunder to the extent that the same first accrue after the Closing Date.

4.      This Assignment (a) will bind and inure to the benefit of Assignor, Assignee and their respective successors and assigns; and (b) will be governed by and construed under the laws of the State of Oregon, without regard to conflicts-of-laws principles that would require the application of any other Legal Requirements, and to the extent applicable, the Bankruptcy Code.

5.      This Assignment may be executed in counterparts, each of which will be an original for all purposes but all of which taken together will constitute one instrument. Fax and pdf signatures will be valid for all purposes of this Assignment.

WESTERN COMMUNICATIONS, INC.         RHODE ISLAND SUBURBAN
                                     NEWSPAPERS INC.

By _____   By _____

Name _____   Name _____

Title _____   Title _____

# EXHIBIT 4.2(a)(iv)(A) TO BEND ASSET PURCHASE AGREEMENT

## FORM OF TRADEMARK
## ASSIGNMENT AND ASSUMPTION AND LICENSE AGREEMENT

This Trademark Assignment and Assumption and License Agreement (**"Agreement"**), effective as of [_____, 2019] (**"Effective Date"**), is between Rhode Island Suburban Newspapers, Inc., a Delaware corporation (**"Buyer"**), and Western Communications, Inc., an Oregon corporation (**"Seller"**).  Buyer and Seller are each referred to as a **"Party"** and collectively as the **"Parties."**

**WHEREAS,** Seller owns all right, title and interest in and to the marks identified on Schedule A and the goodwill associated therewith and symbolized thereby (collectively, the "Marks");

**WHEREAS,** pursuant to and in accordance with that certain Bend Asset Purchase Agreement, dated as of July 3, 2019, by and between Buyer and Seller (the "**Asset Purchase Agreement**"), Seller desires to transfer and assign all of its right, title and interest throughout the world in and to the Marks to Buyer; and

**WHEREAS,** Seller and Buyer are hereby effecting such transfer and assignment of all right, title and interest of the Seller throughout the world in and to the Marks and the goodwill associated therewith and symbolized thereby.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as follows:

1.      **Definitions.**  Unless otherwise defined in this Agreement, terms that are capitalized in this Agreement will be defined as set forth in the Asset Purchase Agreement.

2.      **Assignment.**  For good and valuable consideration, receipt of which is hereby acknowledged, Seller irrevocably transfers and assigns exclusively to Buyer all of Seller's present and future right, title, and interest in and to the Marks, and the goodwill associated therewith and symbolized thereby, used in or held for use in the conduct of the Business, except to the extent the foregoing constitutes Excluded Assets under the Asset Purchase Agreement. Buyer hereby, commencing on and effective from the Closing Date, agrees to assume, perform when due, and become obligated for, each of the Assumed Liabilities associated with the Marks. Seller further assigns to Buyer all right to sue for and receive all damages accruing from past, present and future infringements of the Marks.

3.      **License of Other Rights.**  If Seller has any rights to the Marks used in or held for use in the conduct of the Business that cannot be assigned to Buyer, Seller grants to Buyer, during the term of such rights, an exclusive, royalty-free, perpetual license to use such rights in connection with the operation of the Business or the business of Buyer and its Affiliates. All rights not granted to Buyer in this Agreement are expressly retained by Seller.

**4.** **Future Cooperation.** Upon Buyer's request, Seller will execute and deliver to Buyer all documents necessary to perfect Buyer's right, title, and interest in and to the Marks assigned under <u>Section 2</u> above. Seller hereby irrevocably designates and appoints Buyer and its duly authorized agents as Seller's attorney-in-fact, to act for and in its behalf to execute and file those documents if Buyer is unable, after reasonable effort, to secure Seller's assistance for any reason.

**5.** **Effect.** This Agreement is subject to all the terms and conditions of the Asset Purchase Agreement. The Parties intend that this Agreement shall not modify the applicable terms and conditions of the Asset Purchase Agreement, which governs the Parties' rights and interests in the Marks. Without limiting the foregoing in this Section, this Agreement does not expand, modify or limit any representations or warranties in the Asset Purchase Agreement. This Agreement shall be binding upon each of the Seller and Buyer, and their respective successors and assigns.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

| **SELLER:** | **BUYER:** |
|---|---|
| WESTERN COMMUNICATIONS, INC. | RHODE ISLAND SUBURBAN NEWSPAPERS INC. |
| By | By |
| _____ | _____ |
| Name | Name |
| _____ | _____ |
| Title | Title |
| _____ | _____ |

# SCHEDULE A
## MARKS

# EXHIBIT 4.2(a)(iv)(B) TO BEND ASSET PURCHASE AGREEMENT

## FORM OF COPYRIGHT
## ASSIGNMENT AND ASSUMPTION AND LICENSE AGREEMENT

This Trademark Assignment and Assumption and License Agreement (**"Agreement"**), effective as of [_____, 2019] (**"Effective Date"**), is between Rhode Island Suburban Newspapers, Inc., a Delaware corporation (**"Buyer"**), and Western Communications, Inc., an Oregon corporation (**"Seller"**).  Buyer and Seller are each referred to as a **"Party"** and collectively as the **"Parties."**

**WHEREAS,** Seller owns all right, title and interest in and to the common law copyrights identified on <u>Schedule A</u> and the works associated with such copyrights (collectively, the "<u>Works</u>");

**WHEREAS,** pursuant to and in accordance with that certain Bend Asset Purchase Agreement, dated as of July 3, 2019, by and between Buyer and Seller (the "**Asset Purchase Agreement**"), Seller desires to transfer and assign all of its right, title and interest throughout the world in and to the Works to Buyer; and

**WHEREAS,** Seller and Buyer are hereby effecting such transfer and assignment of all right, title and interest of the Seller throughout the world in and to the Works and the goodwill associated therewith and symbolized thereby.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as follows:

1. **Definitions.**  Unless otherwise defined in this Agreement, terms that are capitalized in this Agreement will be defined as set forth in the Asset Purchase Agreement.

2. **Assignment.**  For good and valuable consideration, receipt of which is hereby acknowledged, Seller irrevocably transfers and assigns exclusively to Buyer all of Seller's present and future right, title, and interest in and to the Works, all copyrights for the Works, and the right to apply for copyrights, registrations and renewals thereof, used in or held for use in the conduct of the Business, except to the extent the foregoing constitutes Excluded Assets under the Asset Purchase Agreement. Buyer hereby, commencing on and effective from the Closing Date, agrees to assume, perform when due, and become obligated for, each of the Assumed Liabilities associated with the Works. Seller further assigns to Buyer all right to sue for and receive all damages accruing from past, present and future infringements of the Works and the copyrights therefor.

3. **License of Other Rights.**  If Seller has any rights to the Works used in or held for use in the conduct of the Business that cannot be assigned to Buyer, Seller grants to Buyer, during the term of such rights, an exclusive, royalty-free, perpetual license to use such rights in connection with the operation of the Business or the business of Buyer and its Affiliates. All rights not granted to Buyer in this Agreement are expressly retained by Seller.

**4.** **Future Cooperation.** Upon Buyer's request, Seller will execute and deliver to Buyer all documents necessary to perfect Buyer's right, title, and interest in and to the Works assigned under <u>Section 2</u> above. Seller hereby irrevocably designates and appoints Buyer and its duly authorized agents as Seller's attorney-in-fact, to act for and in its behalf to execute and file those documents if Buyer is unable, after reasonable effort, to secure Seller's assistance for any reason.

**5.** **Effect.** This Agreement is subject to all the terms and conditions of the Asset Purchase Agreement. The Parties intend that this Agreement shall not modify the applicable terms and conditions of the Asset Purchase Agreement, which governs the Parties' rights and interests in the Works. Without limiting the foregoing in this Section, this Agreement does not expand, modify or limit any representations or warranties in the Asset Purchase Agreement. This Agreement shall be binding upon each of the Seller and Buyer, and their respective successors and assigns.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

**SELLER:** | **BUYER:**

WESTERN COMMUNICATIONS, INC.

RHODE ISLAND SUBURBAN NEWSPAPERS INC.

By
_____

By
_____

Name
_____

Name
_____

Title
_____

Title
_____

## SCHEDULE A
## WORKS

# EXHIBIT 4.2(a)(iv)(C) TO BEND ASSET PURCHASE AGREEMENT

## DOMAIN NAME ASSIGNMENT

This Domain Name Assignment ("**Agreement**"), effective as of [_____, 2019] ("**Effective Date**"), is between Rhode Island Suburban Newspapers, Inc., a Delaware corporation ("**Buyer**"), and Western Communications, Inc., an Oregon corporation ("**Seller**"). Buyer and Seller are each referred to as a "**Party**" and collectively as the "**Parties**."

**WHEREAS**, Seller is the sole and exclusive owner of the domain names (the "Domain Names") and described in Schedule A attached hereto and made a part hereof, which Domain Names are registered with the Registrars listed adjacent to such Domain Names on Schedule A attached hereto.

**WHEREAS**, Buyer, desires to acquire the entire right, title and interest in, to and under the said Domain Names.

**NOW, THEREFORE**, for and in consideration of the sum of Ten U.S. dollars ($10.00), and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, said Seller does hereby sell, transfer, convey and assign to said Buyer the entire right, title and interest in, to and under said Domain Names, together with the goodwill associated therewith, and together with all rights and privileges granted and secured thereby, including the right to sue and recover for any past infringement, said rights to be held and enjoyed by said Buyer**,** for its own use and benefit and for the use and benefit of its successors, assigns or other legal representatives as fully and entirely as the same would have been held and enjoyed by said Seller if this assignment had not been made. Seller further agrees to execute any and all documents and do any such further acts that shall be required in order for Buyer to secure such rights.

**AND**, said Seller hereby covenants that it has full right to convey the entire interest herein assigned.

**AND**, said Seller agrees to take all necessary actions to effectuate transfer of the Domain Names to the Buyer in accordance with the policies of the registrars maintaining said Domain Names, including execution of all required instruments to accomplish such transfer.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, Seller has executed this Domain Name Assignment as of _____, 2019.

**SELLER:**

WESTERN COMMUNICATIONS, INC.

By _____

Name _____

Title _____

# **SCHEDULE A**
# **DOMAIN NAMES**

# EXHIBIT 8.13 TO BEND ASSET PURCHASE AGREEMENT

## PRIVACY AND SECURITY POLICY

Published Nov. 1, 2017 at 08:55AM / Updated Nov. 1, 2017 at 09:04AM

This policy discloses the privacy and security practices for bendbulletin.com and bendhomes.com, which are subject to change from time to time. Any such changes will be posted on this page and you will be bound to such changes by your continued use of the web site. Bendbulletin.com and bendhomes.com are intended for use by adults. Please see our Children's Privacy Statement below for additional safeguards to protect the privacy of personal information collected from children under 13. This policy applies to the web sites (however accessed and/or used), whether via personal computers, mobile devices or otherwise, and other interactive features, applications or downloads that are operated, distributed, or created by us and post this policy. If you have any questions about bendbulletin.com's privacy practices, please contact us via e-mail at privacy@bendbulletin.com.

**What type of information do bendbulletin.com and bendhomes.com collect about their users and how do they use the information?**

If you use the web sites, we use a feature of your browser called a "cookie" to track traffic patterns and usage of our sites. The cookies may contain a number or other information which tells us the type of web browser used, web site pages viewed, and frequency of visiting the web site. You may choose not to accept cookies by changing the preferences on your browser.

If you use the web site to send us information (for example, a letter to the editor or obituary), we collect information about you necessary to support that service. This information includes personally identifiable information such as your name, phone number, e-mail address or other contact information to enable us to follow up with you as needed. If you send an inquiry via e-mail, we may collect your e-mail address.

If you use the web site to purchase or renew a subscription or a single-day pass or to place a classified ad, or if you use a third party app store to download an application, we may collect information necessary to process that order and to send you a confirmation. That information includes personally identifiable information such as your name, address, e-mail address, telephone number, and credit card details.

If you use the web site for location-based information (for example, submitting your location to find a reviewed restaurant's location) or access the website through a mobile device, we collect information about you that is necessary to support that service and to track traffic patterns and usage of the web site. This information may include personally identifiable information such as your geographic location and certain device information. We will only collect this information with your express consent

If you participate in a survey on our web sites, any information collected about you is only what you explicitly agree to provide. If you provide an e-mail address, we may use it

to send you questions we occasionally pose to readers in connection with our news coverage.

If you subscribe to a newsletter or news alert service, we collect your e-mail address in order to provide that service to you.

If you log in to comment on an article, we collect information associated with your account, such as name, user ID, e-mail address or IP address, to authenticate you.

We may work with a data provider to target advertising to you personally, through online and offline methods including email, display media, video media and direct mail. These providers may use personal information that we have collected or that you have provided to locate you online, such as when you visit or log in to websites or mobile applications. When you log in to or visit our website, your IP address may be combined with other de-identified data (such as a hashed, non-readable email or postal address) in order to send ads and materials to you based on your preferences, interests and attributes. To opt out of this and other interest-based advertising, please visit the industry opt-out pages operated by the DAA, at [www.aboutads.info](www.aboutads.info) and by the NAI at [networkadvertising.org](networkadvertising.org).

**With whom do [bendbulletin.com](bendbulletin.com) and [bendhomes.com](bendhomes.com) share the information they collect from their users?**

We use statistical analyses of user behavior to analyze usage of our web site and to develop summary - not individual - reports to inform our advertisers of levels of interest in various areas of our sites and how many users have seen or "clicked" their advertisements. We only disclose information in aggregate form to third parties in such reports.

If you use the web site to purchase or renew a subscription or single-day pass or to place a classified ad, or if you use a third party app store to download an application, the information we collect, including personally identifiable information, will be shared with third parties who perform tasks required to complete the transaction, such as fulfilling subscription orders and processing credit card payments.

If you use the web site for location-based information, the information you submit, including personally identifiable information, will be shared with third parties who perform tasks required to complete the query, such as identifying your geographic location to provide directions.

From time to time, we may solicit your participation in online surveys. If you volunteer to respond to such a survey, we collect demographic and other information about you that we may use to solicit your opinion on stories and events we believe may be relevant to you based on the information that we collected from you through the survey.

If you use the web site through a mobile device, the service you use to access the web site may be provided by a third-party technology provider. When you use these third-party services, personally identifiable information may be collected directly by these third parties. This information will not be collected unless you expressly give them permission to do so. These third-party partners may use personally identifiable information, including your location, to better provide advertisements about goods and services that

may be of interest to you. We are not responsible for the actions and privacy policies of these third parties, and we encourage you to read their privacy statement and user terms and conditions whenever using their services.We may also release personally identifiable information when we believe release is appropriate to comply with applicable laws and government requests, to operate our systems properly or to protect our sites or our users.

We will not sell your personal information to any third party.

**What security measures does bendbulletin.com perform to protect the privacy of personal information received from its users?**

We will take all reasonable steps to safeguard personal information that you provide to us. We use Secure Sockets Layer (SSL) technology during transmission, which encrypts personal information that you provide to us.

Notice regarding personal information collected by third party content providers and links to third party web sites on bendbulletin.comand bendhomes.com:

Sites bendbulletin.com and bendhomes.com and the applications used to view them may contain advertisements and/or links to other web sites on the Internet that are owned and operated by third parties. Bendbulletin.com, bendhomes.com and Western Communications, Inc. do not endorse and are not responsible for the operation of or content located on or through any such third party or third party web site. We do not have control over the personal information collection and use practices of third parties and such third party practices may differ from this privacy policy. You should review the privacy policy of every web site you visit to ensure that you are comfortable with the practices of that particular web site.

**The Bulletin Children's Privacy Statement**

As required by U.S. law, bendbulletin.com and bendhomes.com have created this children's privacy statement to explain our practices with respect to the online collection and use of personal information from children under the age of thirteen.

1. We do NOT knowingly collect personally identifiable information from children under the age of thirteen. If we become aware that we have inadvertently received personally-identifiable information from a user under the age of thirteen, we will delete such information from our records.

2. Because we do not collect any personally-identifiable information from children under the age of thirteen, we also do NOT knowingly distribute such information to third parties.

3. We do NOT knowingly allow children under the age of thirteen to publicly post or otherwise distribute personally-identifiable contact information.

4. We do NOT condition a child's participation in online activities by requiring personally-identifiable information.

5. The dominant page in the bendbulletin.com web site that children might use is our Newspapers in Education page, which contains links to high quality education web sites.

These sites are reviewed and approved as appropriate for children by our Newspapers in Education Coordinator. There are no pages in [bendhomes.com](bendhomes.com) of particular interest to children.

**EXHIBIT 9.1(F) TO BEND ASSET PURCHASE AGREEMENT**

**BEND LEASE**

Attached.

# LEASE

This **LEASE** (this "**Lease"**) is entered into as of _____, 2019[1] (the "**Lease Date**"), by **Western Communications, Inc.**, an Oregon corporation ("**Landlord**"), and _____, a Delaware corporation ("**Tenant**").

## RECITALS

**WHEREAS**, Rhode Island Suburban Newspapers Inc., a Delaware corporation ("**Rhode Island**") is acquiring certain assets and liabilities pursuant to that certain Asset Purchase Agreement dated as of June 25, 2019 (the "**Asset Purchase Agreement**" ), by and among Rhode Island (as purchaser) and The Union Democrat, a California corporation and Landlord (together, "**Seller**"); and

**WHEREAS**, Landlord and Tenant desire to enter into an agreement pursuant to which Tenant shall lease (a) the Premises (as defined below) for a maximum term of 24 months, and (b) the Press Room Space (as defined below) for a maximum term of 180 days following the expiration or earlier termination of the Term, as defined below (the "**PR Term**"); and

**WHEREAS**, Tenant has advised Landlord that Tenant intends to locate certain of its personnel in the Premises and, among other aspects of Tenant's operations in the Premises, to prepare for the removal and relocation of the Printing Press (as defined below) upon the expiration, or accelerated termination, of the term of this Lease. Tenant has further advised Landlord that, upon the expiration, or accelerated termination, of the Term of this Lease, Tenant will no longer have any personnel located in, or operating from, the Premises, but Tenant shall then require the PR Term within which to complete the removal and relocation of the Printing Press; and

**WHEREAS**, Landlord and Tenant desire to each have a unilateral right to terminate this Lease on an accelerated basis (but subject to Tenant's continuing right to possess and use the Press Room Space for the PR Term), on 180 days' advance notice; and

**WHEREAS**, under the terms of the Asset Purchase Agreement, Tenant shall acquire from Seller, among other assets, a certain printing press and ancillary equipment (collectively, the "**Printing Press**").

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and in the Asset Purchase Agreement, Landlord and Tenant agree as follows:

## 1.   Basic Lease Information

| | | |
|---|---|---|
| (a) | Building: | The approximately _____ square foot commercial building commonly known as 1777 SW Chandler Ave, Bend, Oregon, including the entirety of the surface of the land on which such building is located. |

---

[1] **This will be the closing date.**

| | | |
|---|---|---|
| (b) | Premises: | The approximately **[**48,000**]** square foot portion of the Building shown in cross-hatching on **Exhibit A**. The Press Room Space is a portion of the Premises and is depicted, by cross-hatching, on **Exhibit A-1**. |
| (c) | Base Rent | $10,000 per month during the term hereof, but no Base Rent shall be due during PR Term. |
| (d) | Term Expiration Date | The last day of the calendar month in which the second anniversary of the Lease Date occurs, subject, however, to any acceleration thereof to the Early Termination Date (as defined below), pursuant to Section 4.1 below. |
| (e) | Permitted Use | Tenant is permitted to use the Premises and the surface of the entirety of the land on which the Building is located for any use permitted by applicable law, including, but not limited to, printing, publishing, distribution, storage and office use, all in compliance with Section 6. |
| (f) | Tenant's Share | _____% |
| (g) | Security Deposit | None. |
| (h) | Estimated OpEx | $_____ per month |
| (i) | Rent Payment Address | _____ |
| (j) | Landlord Address | Western Communications, Inc. Attn: Betsy McCool 1777 SW Chandler Avenue Bend, OR 97702 |
| (k) | Tenant Address | c/o Rhode Island Suburban Newspapers Inc. Attn: Steven Malkowich Suite 920-1200 West 73rd Avenue Vancouver, British Columbia V6P 6G5 Canada |

**2.** **Lease**. On and subject to the terms and conditions of this Lease, Landlord leases (a) the Premises to Tenant, and Tenant leases the Premises from Landlord, for the Term (as defined in Section 4.1), and (b) the Press Room Space to Tenant, and Tenant leases the Press Room Space from Landlord, for the PR Term. Landlord shall have the right to grant easements, make public dedications, designate, restrict or modify all or any portion of the Premises and create restrictions on or about the Premises, provided that no such easement, dedication, designation, restriction or modification unreasonably adversely affects Tenant's use or occupancy of the Premises (or the Press Room Space, as applicable) for the Permitted Use. At Landlord's request, Tenant shall execute such instruments as may be reasonably necessary with respect to such easements, dedications, designations, restrictions or modifications.

**3.** **Premises**.

**3.1**    The Premises shall be deemed delivered to and accepted by Tenant as of the Lease Date, and Landlord shall have no obligation for any work or improvement at the Premises with respect to Tenant's occupancy or for any defects or conditions with respect to the Premises existing as of the Lease Date, except with respect to Hazardous Materials.  Landlord shall be responsible for any remediation required during the term with respect to Hazardous Materials existing on or below the Premises unless and to the extent that such Hazardous Materials are first located in, on, under or at the Building after the Lease Date and solely as a direct result of any willful or intentional acts or omissions of Tenant, in which event, Tenant shall be responsible for any required removal or remediation directly resulting from such willful or intentional acts or omissions.  Notwithstanding the foregoing, Landlord shall deliver the Premises with all Building systems (including, without limitation, the HVAC system serving the Premises) in working order.

**3.2**    Except as may be specifically provided in this Lease, (a) Landlord makes no representations or warranties of any kind whatsoever, either express or implied or arising by operation of law, with respect to the Premises, including any warranty of condition, habitability, merchantability, suitability or fitness for a particular purpose or otherwise or with respect to the use, condition, title, occupation or management of the Premises, the economic viability, value, safety or security issues relating to the Premises, compliance of the Premises with Laws, or compliance of the Premises with covenants, conditions and restrictions (whether or not of record); and (b) as of the Lease Date the Premises are being leased by Landlord to Tenant in an "AS IS AND WITH ALL FAULTS" condition (subject, however, to Landlord's obligations with respect to Hazardous Materials), Tenant having had the opportunity to investigate the physical condition of the Premises and the Building prior to the Lease Date.

**3.3**    Notwithstanding the foregoing provisions of this <u>Section 3</u>, nothing in this Lease is intended to (nor shall it) derogate from any, or diminish, any of the rights and remedies that Tenant may have (in its capacity as "Purchaser" thereunder) pursuant to the Asset Purchase Agreement.

**4.**    <u>Term</u>.

**4.1**    The "**Term**" shall commence on the Lease Date and shall expire on the Term Expiration Date; <u>provided, however</u>, that Tenant and Landlord shall each have the unilateral right to terminate this Lease (subject, however, to the PR Term) on an accelerated basis, by delivery to the other of Notice ("**Accelerated Termination Notice**") electing an accelerated termination date, which accelerated termination date may be no earlier than 180 days from the date of the delivery of the Accelerated Termination Notice.  The Accelerated Termination Notice shall specify the date of such accelerated termination (the "**Early Termination Date**"), whereupon (a) the Term shall expire on the Early Termination Date, but this Lease shall continue, as to the Press Room Space, only, for the PR Term, and (b) all obligations of Tenant to be performed on or before a Termination shall be required to be performed on or before the Early Termination Date.  As provided above, in all events, however, Tenant shall have continuing possession (on a rent-free basis) of the Press Room Space for the PR Term so as to enable Tenant to arrange and cause the removal of the Printing Press from the Premises. Subject to the PR Term, no exercise by Tenant of any right under this Lease nor any other fact or circumstance shall result in the extension of the Term other than with the express written consent of Landlord to such an extension, which consent may be given or withheld in Landlord's sole and absolute discretion.

**4.2**    Notwithstanding anything to the contrary contained hereunder, and as provided above Tenant shall have non-exclusive possession of the Press Room Space for the PR Term,

3

to arrange for and cause the removal of the Printing Press from the Premises.  Tenant is obligated to and shall cause the removal of the Printing Press from the Premises prior to the end of the PR Term. Tenant shall not pay any rent to Landlord during the PR Term.  This Section 4.2 shall survive a Termination.

**5.**     **Rent**.

**5.1**     **Base Rent.**  During the Term, but not the PR Term, Tenant shall pay to Landlord monthly installments of Base Rent (a) in advance, (b) without demand, abatement, deduction or set-off, (c) on or before the first day of each calendar month during the Term, (d) in lawful money of the United States of America, and (e) at the Rent Payment Address, or to such other Person or at such other place as Landlord may from time to time designate in a Notice.  Payments of Base Rent for any fractional calendar month shall be Prorated.  All prorations required or permitted to be made hereunder shall be made on the basis of a 365-day year and if for a calendar month, then based on the actual number of days in such month ("**Prorated**" or "**Prorations**").

**5.2**     **Operating Expenses**.

**5.2.1**     In addition to Base Rent, during the Term, but not the PR Term, Tenant shall pay to Landlord Tenant's Share of all documented and reasonable expenses (collectively, "**Operating Expenses**") incurred by Landlord and related to management, insurance, utilities, and repair, maintenance and service contracts for the Building.  Tenant shall pay Operating Expenses by making monthly payments of Estimated OpEx (a) in advance, (b) without demand, abatement, deduction or set-off, (c) on or before the first day of each calendar month during the Term, (d) in lawful money of the United States of America, and (e) at the Rent Payment Address, or to such other Person or at such other place as Landlord may from time to time designate in a Notice.  Payments of Estimated OpEx for any fractional calendar month shall be Prorated.  Landlord shall have the right to adjust Estimated OpEx from time to time upon not less than 30 days' prior Notice to Tenant.

**5.2.2**     Within 90 days after the expiration or accelerated termination, as applicable, of the Term (a "**Termination**"), Landlord will deliver Notice to Tenant of the actual Operating Expenses during the Term (along with reasonable evidence thereof) and Tenant's Share thereof.  If Tenant paid more as Estimated OpEx than Tenant's Share of actual Operating Expenses during the Term (an "**Excess**"), Landlord shall, within 30 days after delivery of such Notice, pay to Tenant the amount of such Excess.  If Tenant's Share of actual Operating Expenses during the Term is greater than the amount of Estimated OpEx paid by Tenant to Landlord (a "**Shortage**"), Tenant shall, within 30 days after receipt of Notice thereof, pay to Landlord the amount of such Shortage.

**5.2.3**     This Section 5.2 shall survive a Termination.

**5.3**     **Additional Rent**.  Any and all amounts other than Base Rent that Tenant is or becomes obligated to pay to Landlord under this Lease are referred to as "**Additional Rent**."  Base Rent and Additional Rent are collectively referred to as "**Rent**."  No Base Rent is due during the PR Term.

**5.4** __Taxes__.

    **5.4.1** __Payment.__ Tenant shall pay, prior to delinquency, all taxes, levies, assessments and governmental charges (collectively, "**Taxes**") imposed on or with respect to Tenant or Tenant's use of the Premises by any federal, state, regional, municipal, local or other governmental authority or agency or quasi-public agencies (including business improvement districts and courts, each a "**Governmental Authority**") with respect to all periods of the Term prior to a Termination. Taxes shall not include real property taxes, but will include taxes (a) on, or measured by or based, in whole or in part, on rent payable to Landlord under this Lease and/or from the rental by Landlord of the Premises or any portion thereof; (b) on the operation or maintenance of any portion of the Premises or on the use of any utility service at the Premises; (c) as a license or other fee on the leasing of the Premises; (d) on any Tenant Property; or (e) on any activities of Tenant at the Premises. Tenant's obligation for Taxes with respect to any partial tax year shall be Prorated.

    **5.4.2** __Exclusions__. Taxes shall not include excess profits taxes, franchise taxes, gift taxes, capital stock taxes, inheritance and succession taxes, estate taxes, or federal or state income taxes imposed on Landlord unless such taxes are assessed in substitution for Taxes otherwise payable hereunder. Landlord shall be responsible, at Landlord's sole cost, for all real property taxes assessed against the Premises and/or Building except to the extent that Tenant's personal property, fixtures or improvements are assessed as part of the real property comprising the Premises and/or Building.

**6.** __Use__.

    **6.1** __Laws__. The Premises shall be used solely for the Permitted Use in compliance with all applicable laws, statutes, ordinances, regulations, codes, orders, judgments, directives, permits, licenses, directives and requirements of Governmental Authorities (collectively "**Laws**"). Within three days after Notice from Landlord, Tenant shall discontinue any use of the Premises that has been declared by a Governmental Authority to be in violation of Laws. As of the date hereof, Landlord represents and warrants that Landlord has received no written notice alleging any violation of Laws regarding the Premises and/or Building which remain uncured.

    **6.2** __Restrictions__. Tenant shall use the Premises in a careful, safe and proper manner and shall not commit waste or subject the Premises to uses that would damage the Premises. Tenant shall not use or permit the Premises to be used for any purpose or in any manner that would void Tenant's or Landlord's insurance. Tenant shall reimburse Landlord within 30 days after written demand for any additional premium charged under any insurance policy carried by Landlord and applicable to the Premises by reason of Tenant's failure to comply with the provisions of this Section or otherwise caused by Tenant's use and/or occupancy of the Premises.

    **6.3** __Modifications under Laws__.

    **6.3.1** Tenant, at its sole cost and expense, but subject to Landlord's prior written consent, which may be withheld or conditioned in Landlord's sole and absolute discretion, (a) may make all alterations or modifications to the Premises that are required by Laws due to the occupancy or use of the Premises by Tenant, any affiliate of Tenant or any of such parties' constituent officers, directors, employees, owners, managers, agents, invitees, licensees and contractors (collectively, "**Tenant Parties**"), and (b) shall be solely responsible for all demands, claims, liabilities, losses, costs, expenses, actions, causes of action, actual damages or judgments, and all reasonable expenses incurred in investigating or resisting the

5

same (including reasonable attorneys' fees, charges and disbursements and costs of suit, collectively, **"Claims"**) arising out of or in connection with compliance with Laws related to the use and occupancy of the Premises by Tenant or any other Tenant Party. Tenant indemnifies and agrees to defend, hold and save Landlord harmless from and against any and all Claims arising out of the failure of the use and occupancy of the Premises by any Tenant Party to comply with Laws.

    **6.3.2** Notwithstanding the forgoing, if any alterations or modifications are required by Laws in order for Tenant to continue to use the Premises for the Permitted Use, Tenant may terminate this lease in accordance with <u>Section 4</u> in lieu of performing or paying for the same. Without limiting the foregoing, in no event will Landlord have any obligations to make any such alterations or modifications to the Premises.

    **6.4** <u>**Parking**</u>. Tenant shall have the right to use the parking areas serving the Building (the "**Parking Area**") on a non-exclusive, unassigned, first-come, first-served basis. Landlord shall (a) have the right to reconfigure and regulate and limit the use of the Parking Area, and (b) have no responsibility for, and except to the extent directly caused by the gross negligence or willful misconduct of a Landlord Party, shall not be held liable for, any damage or loss to any vehicles parked in the Parking Area or to any personal property located therein, or for any injury sustained by any person in or about the Parking Area.

    **6.5** <u>**Access**</u>. Tenant shall have access to the Premises (and the Press Room Space) 24 hours per day each day during the Term and the PR Term, but only as to the Press Room Space during the PR Term.

**7.** <u>**Utilities; Services**</u>.

    **7.1** Tenant shall not, without Landlord's prior written consent which may be withheld or conditioned in Landlord's sole and absolute discretion, activate, contract for or purchase any (a) electric, water, gas, sewage or other similar utilities unless the same are separately metered with respect to the Premises, or (b) landscape, property maintenance and repair or other services at or with respect to the Building.

    **7.2** Tenant shall be solely responsible for contracting for, and promptly paying all charges with respect to, all telephone, cable television, internet, janitorial and other similar services to the Premises. Electric, water, gas and sewage shall be contracted for by Landlord, the costs of which shall be included in the Operating Expenses for the Building unless separately metered to the Premises, in which event Tenant shall pay all charges prior to delinquency directly to the provider thereof.

    **7.3** Landlord shall not be liable for the interruption of any services or utilities to the Building or the Premises except to the extent due to the gross negligence or willful misconduct of a Landlord Party.

**8.** <u>**Alterations and Tenant's Property**</u>.

    **8.1** <u>**Alterations**</u>. Except for minor items of a cosmetic nature not affecting the structural components of the Building, Tenant shall not make, or cause to be made, any alterations, additions, or improvements to the Premises ("**Alterations**") without first obtaining Landlord's prior written consent, which consent may be withheld or conditioned in Landlord's sole and absolute discretion. All Alterations shall be completed free and clear of liens and Tenant shall deliver to Landlord "as built" plans therefor. Tenant has no right to make any

6

alterations to the subsurface of the land or any environmental contamination caused by Hazardous Materials contamination in, on or under the Premises, including within the Building as of the Lease Date. Landlord agrees that Tenant is not the "operator" of the subsurface of the land as that term is defined by any environmental law.

**8.2**    **Compliance**. Tenant shall cause, at its sole cost and expense, all Alterations to comply with the terms of this Lease, all insurance requirements and all Laws and shall implement at its sole cost and expense all alterations and modifications inside or outside the Premises required by Laws as a result of Alterations. Tenant shall reimburse Landlord for, and indemnify and hold Landlord harmless from, all Claims arising out of faulty work done by Tenant or its contractors.

**8.3**    **Removal**.

    **8.3.1**   "**Tenant's Property**" means and includes (a) all trade fixtures, furniture, machinery, equipment, millwork, cabinets, files and other personal property of Tenant that may be removed from the Premises without material damage to the Premises, and (b) any items included on **Schedule 8.3** either on the Lease Date or by written agreement of Landlord and Tenant following the Lease Date, if any. Tenant shall remove all of Tenant's Property on or before a Termination, except with respect to the Printing Press, which is separately addressed in Section 4.2 of this Lease.

    **8.3.2**   All property that is not Tenant's Property but is built into the Premises so as to become an integral part of the Premises (collectively, "**Installations**") shall (a) be and shall remain the property of Landlord during the Term and following a Termination, (b) not be removed by Tenant at any time during the Term, and (c) remain on and be surrendered with the Premises as a part thereof upon a Termination. This Section 8.3.2 shall not apply to the Printing Press.

**9.**    **Inspection and Access**. Except as necessitated by an event threatening immediate harm to people or property (an "**Emergency**"), in which case entry may be at any time without prior Notice, upon at least one day's prior Notice to Tenant, Landlord and Landlord's officers, directors, employees, constituent owners, managers, agents, invitees, licensees and contractors (together with Landlord, collectively, "**Landlord Parties**") shall have the right to enter the Premises to complete performance by Landlord as may be required or permitted pursuant to this Lease, and to show the Premises to prospective lessees, lenders, investors and purchasers.

**10.**    **Repairs and Maintenance**.

**10.1**    Tenant, at its sole cost and expense, shall repair and maintain all non-structural portions of the Premises (including, without limitation, ordinary maintenance and repair of the HVAC system) in a good and safe condition suitable for Tenant's occupancy of the Premises during the Term (collectively, "**Tenant Repairs**"). If Tenant fails to make any required Tenant Repair, and does not cure such failure within 30 days after Notice from Landlord thereof (unless such cure is of a nature which cannot be reasonably cured within 30 days in which case Tenant shall have a reasonable amount of time to cure such failure, so long as Tenant is diligently pursuing such cure, not to exceed 60 days), Landlord shall have the right to perform such work and Tenant shall reimburse Landlord for the costs thereof within ten days after demand therefor; provided that if such failure by Tenant relates to or creates an Emergency, Landlord shall have the right to immediately commence the necessary work at Tenant's sole cost and expense. Notwithstanding anything to the contrary herein, except as otherwise expressly provided in this

7

Lease and except to the extent arising solely out of the negligence or willful misconduct of a Landlord Party, Landlord shall have no obligation to perform or pay for any repairs, replacements or maintenance of or to the Premises.

**10.2**   Landlord, at its sole cost and expense, shall repair, replace and maintain any portions of the Building that are not the responsibility of Tenant (including, without limitation, performing any necessary capital replacements).  Notwithstanding anything to the contrary herein, all repairs and replacements to the Building arising out of the gross negligence or willful misconduct of a Tenant Party (whether within the Premises or otherwise) shall be at the sole cost and expense of Tenant.

**11.**   **Mechanic's Liens**.  Within 15 days after Tenant receives any written notice of the filing thereof, Tenant shall discharge, by bond or other means permitted under Laws, each mechanic's lien filed against the Premises or the Building for work claimed to have been done for, or materials claimed to have been furnished to, Tenant, and Tenant shall otherwise keep the Premises and the Building free from any liens arising out of work performed, materials furnished or obligations incurred by, or alleged to have been performed or furnished to or incurred by, Tenant.  If Tenant fails to discharge any such lien as and when required herein, Landlord shall have the right to pay such claim or post a bond or otherwise provide security to eliminate the lien as a claim against the Premises and the cost thereof shall be due from Tenant on written demand therefor.  Any Uniform Commercial Code Financing Statement in connection with a financing by Tenant shall reflect that such financing statement is applicable only to removable personal property of Tenant located within the Premises.

**12.**   **Insurance**.

**12.1**   **Property Insurance**.  Tenant, at Tenant's sole cost and expense, shall procure and maintain in full force and effect with respect to the Premises (or, during the PR Term, the Press Room Space) a policy or policies of property insurance (including, to the extent Landlord deems prudent, sprinkler leakage, vandalism, malicious mischief, earthquake, terrorism, and flood insurance coverage) for full replacement value of the improvements to the Premises and Tenant's Property.

**12.2**   **Liability Insurance.**  Tenant, at Tenant's sole cost and expense, shall obtain and keep in full force and effect with respect to the Premises (or, during the PR Term, the Press Room Space) and Tenant's use thereof commercial general liability insurance in a minimum amount of $2,000,000.00 per claim and $3,000,000.00 in the aggregate for both bodily injury and property damage. The foregoing policy shall name Landlord as an additional insured.

**12.3**   **Policy Requirements.**  All policies of insurance required to be carried under this Lease shall (a) be written by companies rated A- VII or better in Best's Key Rating Guide; (b) show Landlord as an additional insured; and (c) if and to the extent available at commercially reasonable rates, shall require that such policy not be subject to termination unless Landlord has received at least 30 days' written notice thereof.  On or before the Lease Date, and thereafter upon demand therefor, Tenant shall deliver to Landlord a certificate evidencing the insurance required to be maintained by Tenant pursuant to this Lease.  If Tenant fails to procure and maintain insurance as required by this Lease, Landlord shall have the right to obtain such insurance and keep it in effect at Tenant's sole cost and expense.  If Landlord procures insurance on Tenant's behalf, then Tenant shall pay to Landlord all costs for such insurance upon demand.

**13.**   **Casualty; Condemnation**.

**13.1** **Casualty**.

**13.1.1** If the Premises are totally destroyed or are so damaged by fire or other casualty that the Premises cannot in the reasonable opinion of Landlord's architect or engineer be repaired or restored by the Term Expiration Date (a "**Major Casualty**"), this Lease shall terminate on the earlier of (a) the Term Expiration Date, or (b) 15 days after discovery of such damage or destruction, and all insurance proceeds under policies required to be maintained under this Lease shall be paid to and retained by Landlord. If such damage to the Premises can be repaired or restored by the Term Expiration Date or does not materially affect the Tenant's use of the Premises (a "**Minor Casualty**"), Landlord shall commence and proceed with reasonable diligence to repair and restore the Building (excluding any alterations that were performed by Tenant in violation of this lease). During any period of time that all or a material portion of the Premises is rendered untenantable as a result of a Major Casualty or Minor Casualty, the Rent shall abate for the portion of the Premises that is untenantable and not used by Tenant.

**13.1.2** This <u>Section 13.1</u> constitutes an express agreement between Landlord and Tenant with respect to any and all damage to, or destruction of, all or any part of the Premises as a result of a Casualty and no Law have any application to this Lease regarding Casualty to all or any part of the Premises, the parties expressly agreeing that this Lease sets forth their entire understanding and agreement with respect to such matters.

**13.2** **Condemnation**.

**13.2.1** If all or any material part of the Premises is taken for any public or quasi-public use under Laws or by right of eminent domain, or by private purchase in lieu thereof (a "**Taking**"), this Lease shall terminate as of the effective date of the Taking.

**13.2.2** In connection with any Taking, Landlord shall be entitled to receive the entire price or award from such Taking without any payment to Tenant, and Tenant assigns to Landlord Tenant's interest, if any, in such award. Tenant shall have the right, to the extent the same shall not diminish Landlord's award, to make a separate claim against the condemning authority (but not Landlord) for such compensation as may be separately awarded or recoverable by Tenant for moving expenses and damage to Tenant's Property.

**14.** **Tenant Default**. Each of the following events shall be a "**Default**" by Tenant under this Lease.

**14.1** Tenant shall fail to pay any installment of Rent when due, if such failure continues for five days after written notice to Tenant.

**14.2** Tenant (a) makes a general assignment for the benefit of creditors; (b) commences any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or of any substantial part of its property (collectively a "**Proceeding for Relief**"); (c) becomes the subject of any Proceeding for Relief that is not dismissed within 60 days of its filing or entry; or (d) is dissolved or otherwise fails to maintain its legal existence.

**14.3** Tenant fails timely to perform or comply with, as applicable, any provision of this Lease other than those specifically referred to in <u>Section 14.1</u>, and, except as otherwise

9

expressly provided herein, such failure continues for 15 days after Notice thereof from Landlord to Tenant; provided, however, if the nature of such failure is such that the same cannot be cured within 15 days, then no Default shall have occurred so long as Tenant commences to cure such failure within 15 days after the initial Notice thereof from Landlord and thereafter diligently pursues such cure and such cure is completed on or before the 30th day after such initial Notice from Landlord to Tenant.

**15.** **Landlord's Remedies**.

**15.1** **Payment by Landlord; Default Rate**.  Following a Default, Landlord shall have the right, without waiving or releasing any obligation of Tenant under this Lease, to make such payment or perform such act that is the subject of the Default.  All sums so paid or incurred by Landlord, together with interest thereon from the date such sums were paid or incurred at 12% per annum or the highest rate permitted by Laws (the "**Default Rate**"), whichever is less, shall be payable to Landlord on demand.

**15.2** **Late Payment Amounts**.  Late payment by Tenant to Landlord of Rent will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult and impracticable to ascertain.  Therefore, if any installment of Rent is not received within five days following the date due, Tenant shall pay to Landlord an additional sum equal to 5% of the overdue Rent as a late charge.  The parties agree that such late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of late payment by Tenant.  In addition to the late charge, Rent not paid when due shall bear interest at the Default Rate from the date due until paid.

**15.3** **Remedies**.  Following a Default, Landlord, at its option, without further notice or demand to Tenant, shall have in addition to all other rights and remedies provided in this Lease or at law or in equity, the option to pursue any one or more of the following remedies, each and all of which shall be cumulative and nonexclusive, without any notice or demand whatsoever.

**15.3.1** Terminate this Lease, or at Landlord's option, Tenant's right to possession only, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy that it may have for possession or arrearages in rent, enter on and take possession of the Premises and expel or remove Tenant and any other Person who may be occupying the Premises or any part thereof, without being liable for prosecution or any claim for damages therefor.

**15.3.2** On a Termination following a Default, Landlord may recover from Tenant the following:

(a)  The worth at the time of award of any unpaid rent that has been earned at the time of such termination; plus

(b)  The worth at the time of award of the amount by which the unpaid rent that would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

(c)  The worth at the time of award of the amount by which the unpaid rent for the balance of the Term after the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

Case 19-30223-tmb11    Doc 194    Filed 07/03/19

(d)     Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or that in the ordinary course of things would be likely to result therefrom, specifically including brokerage commissions and advertising expenses incurred, expenses of remodeling the Premises or any portion thereof for a new tenant, whether for the same or a different use, and any special concessions made to obtain a new tenant; and

(e)     At Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable Laws.

15.3.3  The term "rent" as used in this Section 15.3 shall be deemed to be and to mean all sums of every nature required to be paid by Tenant pursuant to the terms of this Lease, whether to Landlord or to others. As used in Sections 15.3.2(a) and 15.3.2(b), the "worth at the time of award" shall be computed by allowing interest at the Default Rate. As used in Section 15.3.2(c), the "worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus 1%.

15.3.4  Landlord may continue this Lease in effect after a Default and recover rent as it becomes due (Landlord and Tenant agreeing that Tenant has the right to sublet or assign hereunder, subject only to reasonable limitations). Accordingly, if Landlord does not elect to terminate this Lease following a Default, Landlord may, from time to time, without terminating this Lease, enforce all of its rights and remedies hereunder, including the right to recover all Rent as it becomes due.

15.3.5  Landlord shall use reasonable efforts to mitigate Landlord's damages, to the extent required by law.

**15.4    Effect of Exercise**. Exercise by Landlord of any remedies hereunder or otherwise available shall not be deemed to be an acceptance or surrender of the Premises or a Termination except to the extent Landlord has specifically elected to terminate this Lease, it being understood that a Termination can be effected only by the express written agreement of Landlord and, if applicable, Tenant. Receipt by Landlord of Rent or other payment shall not be deemed a waiver of any breach, and no waiver by Landlord of any provision of this Lease shall be deemed to have been made unless in writing and signed by Landlord. Landlord shall not be liable for, nor shall Tenant's obligations hereunder be diminished because of, Landlord's failure to relet the Premises or collect rent due in respect of such reletting or otherwise to mitigate any damages arising by reason of a Default.

**16.    Limitation on Landlord's Liability**. All obligations of Landlord under this Lease will be binding on Landlord only during the period of its ownership of the Premises other than the indemnity of Landlord provided in Section 23, which shall survive the Lease in accordance with its terms. The term "**Landlord**" in this Lease means the then owner of the Premises. On the transfer by an owner of its interest in the Premises, such transferring owner shall be released and discharged from all obligations of "Landlord" under this Lease accruing after such transfer, and all such obligations shall then be binding on the new owner for the duration of such owner's ownership.

17. **Assignment and Subletting**.

**17.1** **General Prohibition**. Without Landlord's prior written consent (which consent may be withheld in Landlord's sole and absolute discretion), Tenant shall not, directly or indirectly, voluntarily or by operation of law, assign this Lease or sublease the Premises or any part thereof or grant any concession or license within the Premises (each a "**Transfer**"), and any attempted Transfer without Landlord's prior written consent shall be void and of no effect, provided, however, that Tenant, without Landlord's consent, may assign this Lease to an affiliate of Tenant that controls, is controlled by, or is under common control with, Tenant. Subject to the preceding proviso, Tenant is a legal entity and its ownership interests are not actively traded on a public stock exchange or in the over-the-counter market, a transfer or series of transfers within any six month period whereby more than 50% of the voting control of Tenant is transferred to Persons who were not owners of ownership interests of the entity comprising Tenant at the commencement of such six month period shall be deemed a Transfer requiring Landlord's consent. Tenant shall reimburse Landlord on demand as Additional Rent for all of Landlord's actual third-party costs and expenses in connection with Landlord's consideration of any proposed Transfer. Landlord shall have the right, upon receipt of request by Tenant to consent to a Transfer, or upon a deemed Transfer under this Section 17, to terminate this Lease on not less than 30 days' Notice to Tenant.

**17.2** **No Release of Tenant**. Notwithstanding any Transfer, Tenant and any guarantor or surety of Tenant's obligations under this Lease shall at all times remain fully and primarily responsible and liable for the payment of Rent and for compliance with all of Tenant's other obligations under this Lease.

**17.3** **No Waiver**. The consent by Landlord to a Transfer shall not relieve Tenant or any assignees of this Lease or any sublessees of the Premises from obtaining the consent of Landlord to any further Transfer nor shall it release Tenant from full and primary liability under this Lease. The acceptance by Landlord of Rent, or the acceptance of performance of any other term, covenant, or condition hereof, from any Person other than Tenant shall not be deemed to be a waiver of any of the provisions of this Lease or a consent to any Transfer.

18. **Holding Over**.

**18.1** Subject to Tenant's rights to possess and occupy the Press Room Space during the PR Term, if Tenant retains possession of the Premises after a Termination with Landlord's written consent, which may be withheld or conditioned in Landlord's sole and absolute discretion, then unless otherwise stated in such written consent, (a) such possession shall be as a month-to-month tenant, (b) Rent and all other terms and provisions of this Lease shall remain in full force and effect (excluding any expansion or renewal option or other similar right or option) during such holdover period, and (c) as used herein the term "Term" shall be deemed to include such extended period, provided that (i) there shall be no abatement of any kind of Rent and (ii) Base Rent shall be equal to 125% of the Base Rent in effect as of the date of such Termination.

**18.2** Subject to Tenant's rights to possess and occupy the Press Room Space during the PR Term, if Tenant remains in possession of the Premises after a Termination without the written consent of Landlord, Tenant shall immediately become a tenant at sufferance under the terms of this Lease except that (a) Rent shall be equal to 125% of the Base Rent in effect as of the date of such Termination (without taking into account any abatement of any kind of Rent) and thereafter increasing by 25% each 30th day.

12

**19.** **Surrender**.  Subject to Tenant's rights to possess and occupy the Press Room Space during the PR Term, on a Termination, Tenant shall surrender the Premises to Landlord (a) in the condition existing on the Lease Date, ordinary wear and tear excepted, except for any Alterations or Installations permitted to remain in the Premises under the terms of this Lease and otherwise in accordance with the terms and provisions of this Lease, and except for the Printing Press, and (b) broom clean. Tenant will have no obligation to address any environmental contamination by Hazardous Materials existing in, on or under the Premises at the time of surrender, unless the existence thereof is solely the direct result of Tenant's willful or intentional acts or omissions.

**20.** **Estoppel Certificates**.  Tenant shall, within fifteen days after Notice from Landlord, execute and deliver a certificate certifying (a) that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease as so modified is in full force and effect) and the dates to which Rent has been paid, (b) that there are no uncured defaults on the part of Landlord hereunder, or specifying such defaults if any are claimed, and (c) such further factual information as may be requested thereon with respect to the status of this Lease or the Premises that is not reflected in this Lease.  Any such certificate may be relied on by any prospective purchaser or encumbrancer of all or any portion of the Premises.  Tenant's failure timely to deliver such statement shall constitute a Default, and shall be conclusive on Tenant that this Lease is in full force and effect and without modification except as may be represented by Landlord in any certificate prepared by Landlord and delivered to Tenant for execution.

**21.** **Subordination**.  This Lease and Tenant's interest and rights hereunder are and shall be subject and subordinate at all times to the lien of any deeds of trust, mortgages, security instruments and financing statements and any other encumbrances on the Premises now existing or hereafter created on or against the Premises, and all amendments, restatements, renewals, modifications, consolidations, refinancing, assignments and extensions thereof (each a "**Mortgage**"), without the necessity of any further instrument or act on the part of Tenant. Tenant shall (a) at the election of a Holder of a Mortgage, attorn to any such Holder, and (b) execute, acknowledge and deliver a subordination, non-disturbance and attornment agreement with respect to a Mortgage; provided that such agreement shall provide that so long as no Default is continuing, Tenant's right to possession of the Premises shall not be disturbed by the Holder.  "**Holder**" means the beneficiary under a deed of trust, mortgagee under a mortgage or secured party under a security instrument or financing statement.

**22.** **Environmental Requirements**.

    **22.1** **Prohibition/Compliance**.  Except in accordance with applicable Laws, Tenant shall not cause or knowingly permit any party to bring Hazardous Materials into the Building or the Premises or use, store, handle, treat, generate, manufacture, transport, release or dispose of Hazardous Materials in, on or from the Building or the Premises without Landlord's prior written consent, which may be withheld or conditioned in Landlord's sole discretion.  Tenant, at its sole cost and expense, shall operate in the Premises in strict compliance with all Environmental Requirements and shall remove or remediate in compliance with Laws all Hazardous Materials first released on or from the Premises solely as a result of the willful or intentional acts or omissions of Tenant during the Term and in violation of Environmental Requirements.  "**Environmental Requirements**" means all Laws regulating or relating to the environment or the health, safety or environmental conditions on, under, or about the Premises. "**Hazardous Materials**" means asbestos, petroleum products, natural gas liquids, liquefied natural gas, synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas) and

any substance, material, waste, pollutant, or contaminant listed or defined as hazardous or toxic, or regulated by reason of its adverse impact on persons, animals and/or the environment under any Environmental Requirements. As defined in Environmental Requirements, from and after the Lease Date Tenant is and shall be deemed to be the "operator" of Tenant's "facility" and the "owner" of all Hazardous Materials brought on the Premises by a Tenant Party, and the wastes, by-products, or residues generated, resulting, or produced therefrom.

**22.2** __Survival__. The obligations under this <u>Section 22</u> shall survive a Termination.

**22.3** __Notices.__ Tenant shall promptly deliver to Landlord copies of all notices delivered to or received from any Governmental Authority concerning Hazardous Substances or Environmental Claims with respect to the Premises.

**23.** __Indemnification__. Tenant indemnifies and agrees to defend and hold the Landlord Parties harmless from and against any and all Claims actually suffered or incurred by Landlord and directly resulting from (a) injury or death to persons or damage to property occurring within or about the Premises, (b) the use or occupancy of the Premises by Tenant, or (c) a breach or default by Tenant in the performance of its obligations under this Lease; <u>provided</u> that such indemnification shall not apply if and to the extent such Claims arise out of conditions caused by the willful misconduct or gross negligence of a Landlord Party. This <u>Section 23</u> shall survive a Termination.

**24.** __Special Damages__.

**24.1** Landlord shall not be responsible or liable to Tenant for any lost profits, lost economic opportunities or any other form of consequential or punitive damages under or with respect to this Lease.

**24.2** Tenant shall not be responsible or liable to Landlord for any lost profits, lost economic opportunities or any other form of consequential or punitive damages under or with respect to this Lease except to the extent resulting from or arising out of Landlord being prohibited by Law from accessing or using all or any portion of the Premises after a Termination as a result of the breach or default by Tenant of its obligations under this Lease.

**24.3** This <u>Section 24</u> shall survive a Termination.

**25.** __Miscellaneous__.

**25.1** __Notices__. All notices, consents, approvals, requests, invoices or statements provided for or permitted to be given under this Lease ("**Notices**") shall (a) be in writing unless otherwise specifically permitted, and (b) be delivered to the address(es) for the applicable party in <u>Section 1</u>, or such replacement or additional address as such party designates from time to time on not less than 30 days' prior Notice. Notices shall be (i) sent by certified U.S. Mail with return receipt requested; (ii) delivered next Business Day via FedEx, UPS or other nationally recognized overnight courier; or (iii) personally delivered (including delivery by private courier services). All delivery charges must be satisfied by the sending party. Notices shall be deemed duly given when received or delivery is refused; <u>provided</u> that if the day of receipt or refusal is not a Business Day, such Notice shall be deemed duly given as of the next succeeding Business Day.

**25.2    Quiet Enjoyment**.  So long as no Default exists, Tenant shall, subject to the terms of this Lease, at all times during the Term (and the PR Term), have peaceful and quiet enjoyment of the Premises against any Person claiming by, through or under Landlord.

**25.3    Force Majeure**.  Other than in connection with the obligation to pay money, no party shall be held responsible for delays in the performance of its obligations hereunder when caused by causes beyond the reasonable control of such party ("**Force Majeure**").  Force Majeure shall not include any events or causes that can be avoided or minimized by the payment of commercially reasonable amounts.

**25.4    Brokers.**

      **25.4.1**  Landlord represents and warrants that it has not dealt with any broker, agent or other Person (collectively, "**Broker**") in connection with this Lease and that no Broker brought about this Lease on behalf of Landlord.  Landlord indemnifies and agrees to hold Tenant harmless from and against any Claims by any Broker claiming a commission or other form of compensation by virtue of having dealt with Landlord with regard to this lease transaction.

      **25.4.2**  Tenant represents and warrants that it has not dealt with any Broker in connection with this Lease and that no Broker brought about this Lease on behalf of Tenant.  Tenant indemnifies and agrees to hold Landlord harmless from and against any Claims by any Broker claiming a commission or other form of compensation by virtue of having dealt with Tenant with regard to this lease transaction.

**25.5    Entire Agreement, Amendment**.  Without limiting Section 3.3, this Lease constitutes the complete agreement of Landlord and Tenant with respect to the subject matter hereof and supersedes any and all prior representations, inducements, promises, agreements, understandings and negotiations that are not contained herein.  This Lease may not be amended except by an instrument in writing signed by both parties hereto.

**25.6    Recordation**.  Neither this Lease nor any memorandum hereof shall be filed or recorded in any public record.

**25.7    Interpretation**.  The parties have jointly prepared this Lease, each with access to counsel, and (a) none of the provisions hereof shall be construed against one party on the ground that such party is the author of this Lease or any part hereof; and (b) the usual rule of contract construction that resolves ambiguities against the drafter shall not apply.  All defined terms have the meanings given them for all purposes, and such meanings are equally applicable to both the singular and plural forms of the terms defined.  Any agreement, instrument or Law defined or referred to herein (i) means such agreement or instrument or Law as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of Law) by succession of comparable successor Laws; and (ii) includes (in the case of agreements or instruments) all attachments thereto and instruments incorporated therein.  References to a Person are also to its successors and permitted assigns.  Regardless of the referenced gender, pronouns used in this Lease shall include Persons of every kind and character.  The word "**or**" is deemed to mean "and/or."  Any term defined in this Lease by reference to any other agreement or instrument has such meaning whether or not such agreement or instrument is in effect.  References to "$" or to "dollars" means the lawful currency of the United States of America.  The words "**including**" and "includes" and terms of similar import shall be deemed to mean "including, without limitation".  "**Business Days**" means all days other than Saturday, Sunday and other days on which neither

banks nor the U.S. postal service are open for business in the state where the Premises is located. "**Person**" means a natural person or a legal entity. The terms "**hereby**," "**hereof**," "**hereto**," "**herein**," "**hereunder**," and any similar terms, refer to this Lease. Article, Section, exhibit, schedule and addendum headings and the table of contents and index of defined terms are solely for convenience and do not constitute a part, and shall not affect the meaning, construction or effect, of this Lease. References to Articles, Sections, exhibits, schedules and addenda are to the Articles, Sections, exhibits, schedules and addenda of this Lease and all such exhibits, schedules and addenda attached to this Lease are incorporated herein and made a part hereof. If there is any conflict between such exhibits, schedules or addenda and the terms of this Lease, the terms of this Lease shall control.

 25.8 <u>**Limitations on Interest**</u>. It is expressly the intent of Landlord and Tenant at all times to comply with Laws governing the maximum rate or amount of any interest payable on or in connection with this Lease. If Laws are ever judicially interpreted so as to render usurious any interest called for under this Lease, or contracted for, charged, taken, reserved, or received with respect to this Lease, then it is Landlord's and Tenant's express intent that all excess amounts theretofore collected by Landlord be credited on the applicable obligation (or, if the obligation has been or would thereby be paid in full, refunded to Tenant), and the provisions of this Lease immediately shall be deemed reformed and the amounts thereafter collectible hereunder reduced, without the necessity of the execution of any new document, so as to comply with the Laws, but so as to permit the recovery of the fullest amount otherwise called for hereunder.

 25.9 <u>**Choice of Law**</u>. Construction and interpretation of this Lease shall be governed by the internal laws of the state of Oregon, excluding any principles of conflicts of laws.

 25.10 <u>**Severability**</u>. If any clause or provision of this Lease is illegal, invalid or unenforceable under Laws, then the remainder of this Lease shall not be affected thereby. In lieu of each clause or provision of this Lease that is illegal, invalid or unenforceable, there shall be added, as a part of this Lease, a clause or provision as similar in effect to such illegal, invalid or unenforceable clause or provision as shall be legal, valid and enforceable.

 25.11 <u>**Time**</u>. Time is of the essence under this Lease.

 25.12 <u>**No Third Party Beneficiaries**</u>. Landlord and Tenant do not intend for any Person to be a third party beneficiary of this Lease, and the provisions of this Lease shall not impart any legal or equitable right, remedy or claim enforceable by any Person other than the parties that are signatories to this Lease and their successors and permitted assigns; provided that the Landlord Parties shall be third party beneficiaries of the provisions of <u>Section 23</u> and shall have the right to directly enforce such provisions against Tenant.

 25.13 <u>**No Waiver.**</u> Failure or forbearance by any party to exercise any of its rights or remedies under this Lease shall not constitute a waiver of such rights or remedies in that or any other instance. Neither party shall be deemed to have waived any right or remedy resulting from such failure to perform unless it has made such waiver specifically in writing.

 25.14 <u>**Counterparts; Imaged Documents.**</u> This Lease may be executed in one or more counterparts, each of which shall be an original but all of which, taken together, shall constitute only one legal instrument. It shall not be necessary in making proof of this Lease to produce or account for more than one counterpart. The delivery of an executed counterpart of this Lease electronically or by facsimile shall be deemed to be valid delivery thereof with the same effect as delivery of an original executed counterpart. This Lease may be imaged and

stored electronically and (a) such imaged Lease may be introduced as evidence in any proceeding as if it was an original, and (b) no party shall contest the admissibility of such imaged document as evidence in any proceeding.

*[Signatures on next page]*

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the Lease Date.

**TENANT**:

_____, a
_____

By:_____

Printed Name:_____

Title:_____


**LANDLORD**:

**Western Communications, Inc.**, an Oregon corporation

By: _____

Printed Name: _____

Title: _____

**Exhibit A**

**Premises**

**Exhibit A-1**

**Press Room Space**

**<u>Schedule 8.3</u>**

**Tenant's Property**

*If blank, deemed to read "None."*

**SCHEDULE 2.1(h) TO BEND ASSET PURCHASE AGREEMENT**

**<u>ASSUMED CONTRACTS</u>**

None.

# CERTIFICATE OF SERVICE

     I hereby certify that I served the foregoing **NOTICE OF FILING OF ASSET PURCHASE AGREEMENT WITH RHODE ISLAND SUBURBAN NEWSPAPERS INC. (BEND BULLETIN)** on the parties indicated as "ECF" on the attached List of Interested Parties by electronic means through the Court's Case Management/Electronic Case File system on the date set forth below.

     In addition, I served the foregoing on the parties indicated as "Non-ECF" on the attached List of Interested Parties by mailing copies thereof in sealed, first-class postage prepaid envelopes, addressed to the parties' last-known address and depositing in the U.S. mail at Portland, Oregon on the date set forth below.

     DATED this 3rd day of July, 2019.

TONKON TORP LLP


By */s/ Michael W. Fletcher*
    Albert N. Kennedy, OSB NO. 821429
    Michael W. Fletcher, OSB No. 010448
    Attorneys for Debtor

000646/00045/10159940v1

**Page 1 of 1** -  CERTIFICATE OF SERVICE

# LIST OF INTERESTED PARTIES

## *In re Western Communications, Inc.*
## U.S. Bankruptcy Court Case No. 19-30223-tmb11

## ECF PARTICIPANTS

- JONAS V ANDERSON    jonas.v.anderson@usdoj.gov
- MICHAEL W FLETCHER    michael.fletcher@tonkon.com, leslie.hurd@tonkon.com;spencer.fisher@tonkon.com
- SARAH FLYNN    sarah.flynn@usdoj.gov
- ALBERT N KENNEDY    al.kennedy@tonkon.com, leslie.hurd@tonkon.com;spencer.fisher@tonkon.com
- KATHYRN PERKINS    kathryn.e.perkins@usdoj.gov
- CRAIG G RUSSILLO    crussillo@schwabe.com
- BRAD T SUMMERS    summerst@lanepowell.com, docketing-pdx@lanepowell.com
- US TRUSTEE, PORTLAND    USTPRegion18.PL.ECF@usdoj.gov

## NON-ECF PARTICIPANTS

**TOP 20 UNSECURED CREDITORS**

Advantage Newspaper Consultants
501-B Executive Place
Fayetteville, NC 28305

Bank of America
800 Fifth Ave.
Seattle, WA 98104

Carter & Associates
POB 21444
El Cajon, CA 92021

Century Washington Center Inc
POB 700
Bend, OR 97709

Davis Wright Tremaine LLP
c/o Joseph VanLeuven
1300 SW Fifth Ave., #2400
Portland, OR 97201

Eastman Kodak Company Inc.
343 State St.
Rochester, NY 14650

First Interstate Bank
805 NW Bond St.
Bend, OR 97703

Grove Mueller Swank PC
POB 2122
Salem, OR 97308-2122

Harrigan Price Fronk & Co. LLP
2796 NW Clearwater Dr.
Bend, OR 97703-7008

Homeland Fireworks Inc
POB 7
Jamieson, OR 97097

Journal Graphics Inc
2840 NW 35th Ave.
Portland, OR 97210

Karnopp Petersen LLP
350 SW Bond St., #400
Bend, OR 97702

Newscycle Solutions Inc.
POB 851306
Minneapolis, MN 55485-1306

Oregon Web Press Inc.
263 29th Ave., SW
Albany, OR 97322

Pacific Power Inc
POB 26000
Portland, OR 97256

Page Cooperative Inc.
700 American Ave., #101
King of Prussia, PA 19406

Sacramento Bee
c/o Paul J. Pascuzzi
Felderstein Fitzgerald
  Willoughby & Pascuzzi LLP
400 Capitol Mall, #1750
Sacramento, CA 95814

Southern Lithoplate Inc.
POB 741887
Atlanta, GA 30374

Sun Chemical Inc
POB 2193
Carol Stream, IL 60132-2193

United Way of Deschutes County
POB 5969
Bend, OR 97708

**UCC PARTIES**

Hitachi Capital America Corp.
7808 Creekridge Circle, #250
Edina, MN 55439

Imaging Financial Services, Inc.
POB 35701
Billings, MT 59107

**PROPERTY TAXES**

Baker County Tax Collector
1995 3rd St., #140
Baker City, OR 97814

Curry County Tax Collector
POB 1568
Medford, OR 97501

Del Norte County Tax Collector
981 H St., #150
Crescent City, CA 95531

Deschutes County Tax Collector
POB 7559
1300 NW Wall St., #200
Bend, OR 97701

Tuolumne County Tax Collector
POB 3248
Sonora, CA 95370-3248

Union County Assessor/Tax Collector
1001 4th St., Suites A & B
La Grande, OR 97850

Yazoo County Tax Collector
POB 108
Yazoo City, MS 39194

**OTHER**

Andrews McMeel Universal
Andrews McMeelsynd/
  Universal Uclick
POB 843345
Kansas City, MO 64184-3345